# NO. 05-20125

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                              Plaintiff-Appellee,
v.

OLABODE TIMOTHY ARANSIOLA,
also known as BJ, also known as Bolaji;
TAIYE KASSIM,
                              Defendants-Appellants.
_____

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division, Criminal No. H-03-436
_____

BRIEF OF PLAINTIFF-APPELLEE
_____

CHUCK ROSENBERG
United States Attorney

JAMES L. TURNER
Assistant United States Attorney

RENATA A. GOWIE
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208-1129
(713) 567-9102
ATTORNEYS FOR APPELLEE

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is unnecessary in this case. The issues presented in this case are neither novel nor complex. The facts and legal arguments are adequately presented in the briefs and record; oral argument would not significantly aid the decisional process. Fed. R. App. P. 34(a)(2)(C).

# **TABLE OF CONTENTS** <u>**Page**</u>

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A. Course of Proceedings and Disposition Below . . . . . . . . . . . . . . . . . . . . 3

   B. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1. Oboh's and Oboite's Smuggling Trips . . . . . . . . . . . . . . . . . . . . . . 5

      2. Atori's Smuggling Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      3. Kazeem's Smuggling Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      4. Oludare Adeyemi's Smuggling Trip . . . . . . . . . . . . . . . . . . . . . . . . 20

      5. Akar's Smuggling Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      6. George's Smuggling Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      7. Tokunbo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      8. Faleru . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      9. Additional Evidence Implicating Aransiola and Kassim . . . . . . . . . . . 46

## **TABLE OF CONTENTS**                    **Page (s)**
(continued)

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   I.  The evidence is sufficient to support Aransiola's and Kassim's convictions. (Responsive to Aransiola's Issues 7-10 and Kassim's Issue 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      B.  Offense Elements: Counts 1& 2 . . . . . . . . . . . . . . . . . . . . . . . . . 54

      C.  Offense Elements: Counts 3 & 6 . . . . . . . . . . . . . . . . . . . . . . . 55

      D.  Aransiola (Bolaji) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      E.  Kassim (Sodik) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

   II.  The district court acted within its discretion in denying Kassim's motion for mistrial.  (Responsive to Kassim's Issue 1) . . . . . . . . . . . . . . 65

      A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

      B.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

      C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

# TABLE OF CONTENTS                 Page (s)
### (continued)

III.  There is no claim under *United States v. Booker*, 125 S. Ct. 738 (2005) because Aransiola and Kassim were sentenced under advisory Guidelines.  (Responsive to Aransiola's Issues 1-5 and Kassim's Issue 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    B.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    C.  There is no *Booker* error because Aransiola and Kassim were sentenced under advisory Guidelines. . . . . . . . . . . . . . . . . . . . . 71

IV.  The two-level adjustment for use of a minor under USSG § 3B1.4 was correctly applied to Aransiola.  (Responsive to Aransiola's Issue 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

V.  Kassim's challenge to the court's methodology in determining drug quantity is waived under the invited-error doctrine.  Alternatively, the court did not plainly err in determining the drug quantity attributable to Kassim at sentencing.  (Responsive to Kassim's Issue 4) . . . . . . . . . . . . . 77

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    B.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## **TABLE OF CONTENTS**                    **Page (s)**
(continued)

VI.  The district court's factual finding that Kassim was a manager or supervisor is plausible in light of the entire record and thus not clearly erroneous.  (Responsive to Kassim's Issue 5) . . . . . . . . . . . . . . . . . . . . . . 83

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

# TABLE OF AUTHORITIES

**Case(s)**                                                                  **Page(s)**

*Apprendi v. New Jersey,* 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Blakely v. Washington,* 542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Akpan*, 407 F.3d 360 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . 65

*United States v. Booker*, 125 S.Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Boudreau*, 250 F.3d 279 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . 75

*United States v. Brugman*, 364 F.3d 613 (5th Cir.),
     *cert. denied,* 125 S.Ct. 212 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994) . . . . . . . . . . . . . . . . 80, 81

*United States v. Castilla*, 20 F.3d 600 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 55

*United States v. Cathey*, 259 F.3d 365 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 61

*United States v. Cooper*, 274 F.3d 230 (5th Cir. 2001) . . . . . . . . . . . . . 80, 81, 85

*United States v. Creech*, 408 F.3d 264 (5th Cir.),
     *cert. denied,* 126 S.Ct. 777 ( 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . 67

*United States v. Duncan*, 919 F.2d 981 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . 53

*United States v. Escobar*, 674 F.2d 469 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . 67

*United States v. Garcia-Abrego*, 141 F.3d 142 (5th Cir. 1998) . . . . . . . . . . . . . . 55

*United States v. Garcia-Flores*, 246 F.3d 451 (5th Cir. 2001) . . . . . . . . . . . . . . 56

# TABLE OF AUTHORITIES
(continued)

**Case(s)**                                               **Page(s)**

*United States v. Gonzales*, 121 F.3d 928 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . 56

*United States v. Gonzalez*, 262 F.3d 867 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . 76

*United States v. Guerrero*, 169 F.3d 933 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 61

*United States v. Hayes*, 342 F.3d 385 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . 53

*United States v. Herrera*, 313 F.3d 882 (5th Cir. 2002) . . . . . . . . . . . . . . . . 51, 53

*United States v. Jimenez*, 256 F.3d 330 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . 77

*United States v. Johnson*, 87 F.3d 133 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . 53

*United States v. Lewis*, 386 F.3d 475 (2nd Cir. 2004),
  *cert. denied,* 125 S.Ct. 1355 ( 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Lowder*, 148 F.3d 458 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . 81

*United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979) . . . . . . . . . . . . . . . . 55

*United States v. Mares*, 402 F.3d 511 (5th Cir.),
  *cert. denied,* 126 S.Ct. 43 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 72, 73

*United States v. McClain*, 252 F.3d 1279 (11th Cir. 2001) . . . . . . . . . . . . . . . . 76

*United States v. Medina*, 161 F.3d 867 (5th Cir. 1998) . . . . . . . . . . . . . 54, 60, 64

*United States v. Mergerson*, 4 F.3d 337 (5th Cir. 1993) . . . . . . . . . . . . . . . . 52, 56

*United States v. Moreno*, 185 F.3d 465 (5th Cir. 1999) . . . . . . . . . . . . . 57, 59, 60

*United States v. Olano*, 507 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . 78

# TABLE OF AUTHORITIES

<u>Case(s)</u>                              (continued)____                    _____<u>Page(s)</u>

*United States v. Pena*, 949 F.2d 751 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Peters*, 283 F.3d 300 (5th Cir. 2002) . . . . . . . . . . . . . . . . passim

*United States v. Raymer*, 876 F.2d 383 (5th Cir. 1989) . . . . . . . . . . . . . . . . 54, 77

*United States v. Ramirez-Velasquez*, 322 F.3d 868 (5th Cir. 2003) . . . . . . . . . . 54

*United States v. Route*, 104 F.3d 59 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Solis*, 299 F.3d 420 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . 54, 77

*United States v. Thornton*, 306 F.3d 1355 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . 76

*United States v. Valencia*, 44 F.3d 269 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . 83

*United States v. Villarreal*, 324 F.3d 319 (5th Cir. 2003) . . . . . . . . . . . . . . 52, 53

*United States v. Virgen-Moreno*, 265 F.3d 276 (5th Cir. 2001) . . . . . . . . . . 54, 55

*United States v. Webster*, 750 F.2d 307 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . 67

*United States v. Westbrook*, 119 F.3d 1176 (5th Cir. 1997) . . . . . . . . . . . . . . . 60

*United States v. Williams-Hendricks*, 805 F.2d 496 (5th Cir. 1986) . . . . . . . . . . 56

## Rules and Statutes

Fed. R. App. P. 4(b)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 34(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

# TABLE OF AUTHORITIES
(continued)

**Rules and Statutes**                                                      **Page(s)**

Fed. R. Crim. P. 32(i)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

18 U.S.C. § 1952(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 72, 73

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

21 U.S.C. § 841(b)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 59

21 U.S.C. § 841(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

21 U.S.C. § 841(b)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 54

21 U.S.C. § 952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

21 U.S.C. § 952(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 960 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 54

21 U.S.C. § 960(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# TABLE OF AUTHORITIES
(continued)

**Rules and Statutes**                                                                 **Page(s)**

21 U.S.C. § 960(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 59

21 U.S.C. § 963 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 54

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Sentencing Guidelines**

USSG § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

USSG § 2D1.1, cmt. n. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

USSG § 2D1.1(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69, 78

USSG § 3B1.1, cmt. n. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

USSG § 3B1.1, cmt. n. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

USSG § 3B1.1, cmt. n. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

USSG § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

USSG § 3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 83, 84

USSG § 3B1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 74, 75, 76

USSG § 3B1.4, cmt. n. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

# No. 05-20125

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                              Plaintiff-Appellee,


v.


OLABODE TIMOTHY ARANSIOLA,
also known as BJ, also known as Bolaji;
TAIYE KASSIM,
                              Defendants-Appellants.

_____

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division, Criminal No. H-03-436

_____

BRIEF OF PLAINTIFF-APPELLEE

_____

The United States of America, Plaintiff-Appellee, by the United States Attorney for the Southern District of Texas, files this brief in response to the separately-filed briefs of Defendants-Appellants Olabode Timothy Aransiola and Taiye Kassim.

## STATEMENT OF JURISDICTION

This was a prosecution of offenses against the laws of the United States; the district court had jurisdiction under 18 U.S.C. § 3231. Aransiola and Kassim appeal from the judgments imposed by the district court (Atlas, J.) on January 31, 2005, and entered on February 9, 2005 (1 R. 494; 4 R. 356).[1] On January 31, 2005, the district clerk timely filed notice of appeal on Kassim's behalf (1 R. 461); Fed. R. App. P. 4(b)(1)(A)(i), (2). On February 9, 2005, Aransiola timely filed notice of appeal (4 R. 371); Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I. Whether the evidence is sufficient to support Aransiola's and Kassim's convictions.

II. Whether the district court acted within its discretion in denying Kassim's motion for mistrial.

III. Whether there is no claim under *United States v. Booker*, 125 S. Ct. 738 (2005) because Aransiola and Kassim were sentenced under advisory Guidelines.

IV. Whether the two-level adjustment for use of a minor under USSG § 3B1.4 was correctly applied to Aransiola.

---

[1] The appellate record ("R.") is cited by volume and page numbers. The pre-sentence report ("PSR") is cited by paragraph number.

2

V.   Whether Kassim's challenge to the court's methodology in
determining drug quantity is waived under the invited-error doctrine.
Alternatively, whether the court plainly erred in determining the drug
quantity attributable to Kassim at sentencing.

VI.   Whether the district court's factual finding that Kassim was a
manager or supervisor is plausible in light of the entire record and thus
not clearly erroneous.

## STATEMENT OF THE CASE

A.    Course of Proceedings and Disposition Below

On April 6, 2004, a multi-count superseding indictment charged Kassim,

Aransiola, and nine codefendants with drug offenses (3 R. 102-16; 5 R. 1-14).  On

June 25, 2004, the jury found Kassim and Aransiola guilty of counts one and two:

(1) conspiracy to import one kilogram or more of a substance containing a detectable

amount of heroin, in violation of 21 U.S.C. §§ 952(a), 960(a), (b)(1)(A), and 963; (2)

conspiracy to possess with intent to distribute one kilogram or more of a substance

containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(A)(i), and 846 (1 R. 397; 3 R. 112-16; 4 R. 317; 5 R. 10-14).

The jury additionally found Kassim guilty of counts three, four, and six: (3)

aiding and abetting possession with intent to distribute heroin on September 10, 2001,

in violation 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1), (b)(1)(C); (4) interstate travel

to promote a drug trafficking enterprise on September 10, 2001, in violation of 18

3

U.S.C. §§ 2 and 1952(a)(3); and (6) aiding and abetting possession with intent to distribute heroin on December 2, 2001, in violation 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1), (b)(1)(C) (1 R. 397; 3 R. 108, 110-11).

On January 31, 2005, the court sentenced Aransiola to 360 months in prison, followed by five years of supervised release (4 R. 354-36; 22 R. 54). The court imposed a $200 special assessment, but no fine (4 R. 352; 22 R. 55). Immediately thereafter, the court sentenced Kassim to a total of 324 months in prison: 324 months on counts one and two; 240 months on counts three and six; and 60 months on count four, all to run concurrently (1 R. 492-94; 22 R.66-67). The prison term is followed by a five-year supervised release term (1 R. 491; 22 R. 67). The court did not impose a fine, and it remitted the $500 special assessment, upon the government's motion (1 R. 489; 22 R. 68).

B.     Statement of Facts

This is a heroin trafficking operation led by Koyode Lawrence ("Papa"), in which couriers with dual citizenship in Nigeria and the United States swallowed heroin pellets and flew from Accra, Ghana to various United States cities, particularly Washington D.C., Minneapolis, and Houston. Adetokunbo Adeniji ("Tokunbo") and Olumide Faleru, who were once couriers, escorted the couriers to Chicago, where they passed the heroin. Aransiola ("Bolaji") trained the couriers in Accra, sent them

4

to the United States, and oversaw them in Chicago. He also instructed Tokunbo and Faleru on picking up the couriers. Kassim ("Sodik") received the heroin in Chicago, paid the couriers, and sometimes escorted them to Chicago. The jury heard testimony from Tokunbo and Faleru, as well as from several couriers: Oluwatoyin Oboh; Akomen Oboite; Odiri Ann Atori; Suliamon Oluwatoyin Kazeem; Oludare Adeyemi; Eyako Akar; and Datubo Brice George. Airline records corroborated the couriers' testimony. The trial evidence is detailed below.

1. *Oboh's and Oboite's Smuggling Trips*

Oluwatoyin Oboh had dual citizenship in Nigeria and the United States (16. R. 42-43). Oboh was born in Florida, where his Nigerian parents were attending college, but he moved to Nigeria when he was seven weeks old and remained there until July 2000, when he moved to Colorado (16 R. 43-45, 62).

In February 2000, Oboh met Koyode Lawrence, commonly called "Papa," in Lagos, Nigeria at Papa's house on 37 Glover Street (16 R. 54-57, 61, 127; Gov. Exs. 3-4). Glover street is commonly known in Nigeria as a "drug place" (16 R. 57). Oboh was going to smuggle drugs into the United States for Papa by swallowing drug pellets (16 R. 54-58). Papa tested Oboh's ability to swallow pellets by having Oboh swallow 100 pellets of corn flower and then later 100 cola nuts (16 R. 58-59).

5

In November 2001, Oboh traveled from the United States to Accra, Ghana to smuggle drugs for Papa for between $5,000 and $8,000 (16 R. 62-63). Oboh met Papa at the Presidential Hotel in Accra (16 R 63). Papa took Oboh to the California Hotel to meet fellow drug smugglers – Suliamon Oluwatoyin Kazeem, and two sisters, Olabisi Kazeem ("Bisi"), and Omolara Kazeem ("Lara")[2] (16 R. 64-66, 141-44; 17 R. 215). Oboh was going to travel with Lara (16 R. 64-66). Lara was 14 years old and she looked her age (16 R. 119; 17 R. 240).

Oboh's and Lara's smuggling trip was December 1-2, 2001 (16 R. 61). Papa and a man named Tunde brought the drugs to Oboh and Lara at the Presidential Hotel; Oboh swallowed 70 to 100 pellets in about eight hours, and Lara also swallowed a substantial amount (16 R. 66-69, 145-46). Papa was present when Oboh and Lara swallowed the pellets; they vomited during the process (16 R. 68-69). Kazeem had tried to swallow some pellets, but he did not make the trip that day (16 R. 68). After Oboh and Lara finally swallowed the pellets, Papa told them to walk around to help with digestion, which they did (16 R. 69-70). At Papa's direction, Oboh and Lara took separate taxis to the airport, obtained their boarding passes for their flight, and returned to the hotel (16 R. 70-71, 146-47). Papa told Oboh and Lara

---

[2] While names in the United States tend to be shortened by omitting the end of the name, as in Greg for Gregory, names in Nigeria tend to be shortened by omitting the beginning of the name, as in Toyin for Oluwatoyin and Tokunbo for Adetokunbo (19 R. 135).

that someone would pick them up in Houston and they would fly to Chicago (16 R. 71). Papa gave Oboh a bag of clothes, $200, and an address to write on the U.S. Customs declaration form (16 R. 71-72).

On December 1, 2001, Oboh and Lara flew KLM Airlines from Accra to Amsterdam to Houston Intercontinental Airport, arriving December 2, 2001, but did not sit together because Papa said it would look suspicious (16 R. 72-73, 76; 19 R. 128-33, 233; Gov. Ex. 64). The trip took 18 hours; Oboh's stomach hurt and he accidentally passed about 20 pellets in the plane's restroom (16 R. 73-74, 150, 194). Oboh filled out a Customs declaration form on the plane, using the address Papa had given him – a Houston address on Angel Island Lane (16 R. 74-75; Gov. Ex. 6). The address was a dwelling rented by Adetokunbo Adeniji ("Tokunbo")'s uncle (19 R. 139, 149).

At Houston Intercontinental, Larry Johnson greeted Oboh and Lara and took them to the United Airlines ticket counter (16 R. 77-79, 152, 157). Using the $200 that Oboh and Lara each had been given and some of his own money, Johnson purchased tickets for Oboh and Lara to Chicago (16 R. 78-79). Oboh and Lara flew to Chicago on the same flight (16 R. 79). The passenger lists for KLM flight 590 from Accra to Amsterdam on December 1, 2001; KLM flight 661 from Amsterdam to Houston on December 2, 2001; and United Airlines flight 670 from Houston to

Chicago on December 2, 2001, were admitted at trial (19 R. 128-31; Gov. Ex. 64).

Oboh and Florence Martins were the only names that appeared on all three flights (19

R. 131-32). Oboh and Martins sat next to each other in seats 12E and 12F on the

Chicago flight (19 R. 132-33). Martins was later identified as Bisi's sister Lara (19

R. 233).

A man named "Sodik" picked up Oboh and Lara at the Chicago airport in a

green SUV and took them to a restaurant and then to his apartment on Kenmore Street

(16 R. 79-82). Inside Sodik's apartment, Sodik told Oboh and Lara to expel their

pellets in the bathtub and then wash the pellets (16 R. 82-83). Sodik gave them a

prepaid cellular phone and left (16 R. 83-84). Sodik also gave Oboh his two cellular

phone numbers (16 R. 115). After Oboh's day-long painful process of passing the

pellets, Sodik paid Oboh $3,000 (16 R. 83-84, 88).

Papa and Sodik wanted Oboh to find additional smugglers – U.S. citizens of

Nigerian descent with U.S. passports (16 R. 93-94). Akomen Oboite was born in

New York, but moved to Nigeria when she was 11 months old (17 R. 34-35). Oboh

told Oboite he had earned money from smuggling heroin for Papa; Oboite was

interested in the drug smuggling, so Oboh had her speak on the phone with Papa and

Sodik (16 R. 91-95; 17 R. 37-39, 73-74). Papa told Sodik about Oboite, and in

December 2001, Oboite flew to Chicago to meet Sodik at Sodik's expense (16 R. 95;

8

17 R. 40-41). Oboite remained in Chicago for three to four days during which she saw Sodik a lot (17 R. 42). Sodik told Oboite it was easy to swallow the balloon (pellets) (17 R. 42-43). From late 2001, to early 2002, Oboite and Sodik spoke on the phone frequently (17 R. 107-08). At trial, Oboite identified Sodik [spelled Sediq in the transcript] as Kassim (17 R. 40).

In January 2002, Papa called Oboite and told her Sodik would send her some money to fly to Accra (17 R. 44-47, 74-75). Sodik sent Oboite a total of $1,320 via Western Union (17 R. 44-46, 75). Papa picked up Oboite from the airport and took her to the California Hotel, where they spent the night (17 R. 47, 76). The next day, Papa and Oboite took a taxi to Papa's house at 37 Glover Street in Lagos (17 R. 47-48). Papa tested Oboite and two other smugglers, Oludare and Olukemi Adeyemi, to see how many pellets they could swallow (16 R. 96-100; 17 R. 54-55, 79-80). Oboite later traveled to a hotel in Accra with "Bolaji," whom she identified at trial as Aransiola;[3] the trip took about three or four hours (16 R. 100-02; 17 R. 53-54, 56, 60). The next day, Oboh took a taxi with Tunde from Lagos to the same hotel in Accra (16 R. 100-02; 17 R. 53-54, 60, 84).

---

[3] Oboite identified the defendant wearing a white shirt with stripes and sitting at table two as Bolaji (17 R. 53-54). On the same day, Kazeem and Oludare Adeyemi identified the same defendant as Bolaji, and the record expressly reflects they identified Aransiola (17 R. 252, 348-49).

9

Tunde and Oboh met Bolaji and Oboite at the hotel; Tunde and Bolaji had brought drug pellets (16 R. 101, 103-04; 17 R. 57-58, 61, 85-87). Bolaji gave Oboh and Oboite the drugs to swallow, for later delivery in Chicago to Sodik; Oboite understood that Sodik would pay her $35,000 (17 R. 64, 129-30). Oboh swallowed over 100 heroin pellets in about eight hours, but he got sick in the process (16 R. 104; 17 R. 22-23). Oboite swallowed 113 pellets (17 R. 58). Bolaji instructed Oboh and Oboite to swallow the drugs, to walk around, to get their boarding passes at the airport, and to return to the hotel (16 R. 105-06; 17 R. 60-61).[4] Bolaji bought their tickets, and gave them an address to write on the Customs declaration form (16 R. 196-97; 17 R. 61, 124).

Oboh and Oboite flew KLM Airlines from Accra to Amsterdam to Houston, arriving February 18, 2002, but did not sit together (16 R. 106-07; 17 R. 59, 61-62; Gov. Exs. 17-18). Oboh was to be paid between $5,000 and $10,000 for his drug courier services (16 R. 53). Oboh accidentally "lost" some of his 100 heroin pellets in the airplane's toilet (16 R. 48-49, 52, 194; 17 R. 23). Oboite had a "runny stomach" and passed about 39 pellets in the plane's toilet (17 R. 58-59). Oboh was nervous when he went through Customs in Houston, and after admitting to inspectors

---

[4] Oboite testified on cross-examination that Bolaji obtained the boarding passes (17 R. 89).

10

that he was carrying drugs, he agreed to an x-ray (16 R. 109-11). Oboite also agreed to an x-ray (17 R. 63). The x-rays revealed foreign objects the size of a big coin or button inside their colons (16 R. 110; 17 R. 139-44; Gov. Exs. 19 & 20). Oboh and Oboite were taken to a hospital, where they ingested a liquid laxative and eventually passed the drugs (16 R. 111; 17 R. 63-64; 19 R. 100-01). On February 18, 2002, Oboh was arrested for heroin smuggling and he later pleaded guilty before Judge Hoyt (16 R. 48-49, 89; 19 R. 112-13). Oboite was also arrested, and she later pleaded guilty to conspiracy to distribute heroin (17 R. 35-36).

Immigration and Customs Enforcement (ICE) Agent Greg Tyler took custody of the drugs, which were analyzed by the Houston Police Department laboratory (19 R. 101-02). Oboh's lab report showed he carried 97 heroin pellets, weighing 857.4 grams at 43.9 percent purity (19 R. 102-03; Gov. Ex. 21). Oboite's lab report showed she carried 77 heroin pellets, weighing 641.5 grams at 49.6 percent purity (19 R. 103; Gov. Ex. 22).

Agent Tyler interviewed Oboh and Oboite several times during the investigation (19 R. 105, 108-10). From the interviews, Agent Tyler learned that Koyode Lawrence, nickname Papa, had supplied the heroin in Nigeria, and that the heroin was intended for Sodik in Chicago (16 R. 115; 19 R. 110-11). Agent Tyler also learned that Oboh had seen other heroin smugglers during his first trip, including

11

Kazeem and Bisi (19 R. 134). Oboh, through his attorney, gave the agent Sodik's passport photograph, which Sodik had given Oboh (16 R. 116-19; 19 R. 224-25; Gov. Ex. 11). At the time of his arrest, Oboh had a piece of paper with the name "Sadiq" and two telephone numbers (19 R. 112; Gov. Ex. 10). Oboh gave the agent Papa's land line telephone number from memory (19 R. 114).

Agent Tyler subpoenaed subscriber information for the telephone numbers on Oboh's piece of paper (19 R. 115). Verizon records showed one number was a pre-paid cellular phone activated December 3, 2001 (19 R. 115-17, 307; Gov. Ex. 7). Oboh's first smuggling trip was December 2, 2001, and he had been given a cellular phone (19 R. 115-17). The phone records showed several phone numbers with a 281 area code, which is a suburban Houston area code (19 R. 119). Agent Tyler dialed one of the numbers and determined it was the Mariott hotel at Houston Intercontinental airport (19 R. 119-20). Agent Tyler subpoenaed the hotel's guest list for February 18, 2002, which showed that Yommy Johnson had spent the night at the hotel, checking out February 19, 2002 (19 R. 120-22; Gov. Ex. 62).

The Customs inspectors told Agent Tyler that Oboite had a reservation for a Continental flight from Houston to Chicago on February 18, 2002 (19 R. 123). Customs has a computer system that allows it to access the passenger list of all flights arriving into the United States from a foreign airport (19 R. 124-25). A passenger

12

name record (PNR) shows reservations made by one person and indicates whether multiple people are on a single reservation (19 R. 125-26).  Agent Tyler subpoenaed Continental's PNR, which showed that a prior reservation had been made for Oboite, Yommy Johnson, and Toyin Alejo (Toyin is Oboh's first name) from Houston Intercontinental to Chicago O'Hare on February 18, 2002 (19 R. 123-28; Gov. Ex. 61).  According to the PNR, the three passengers did not appear for the flight [Oboh and Oboite were arrested on February 18, 2002] (19 R. 128).

    2.  *Atori's Smuggling Trips*

Odiri Ann Atori was born in New York, but moved to Nigeria when she was 3.5 years old (17 R. 147).  She had a U.S. passport (17 R. 148).  In 2000, Atori went to Lagos to bring drugs into the United States "because the drug dealers live in Lagos" (17 R. 149-50).  Atori spoke to a man named Yommy, who tested her ability to swallow non-drug pellets (17 R. 150-52).  Atori swallowed 83 pellets of heroin in Accra, and then flew from Accra to Baltimore/Washington D.C. (BWI), and took a bus to Chicago (17 R. 152-53).  In Chicago, Atori took a cab to a motel, where she met another man named Yommy (17 R. 153-54).  Atori passed the pellets and gave them to Yommy #2, who paid her $6,500 (17 R. 154-55).

Atori's second trip occurred on September 10, 2001 (17 R. 171).  She had been introduced to Papa at his house on Glover Street, where she was again tested on her

ability to swallow non-drug pellets (17 R. 155-59). There were other people at Papa's house, including Oyinna Chika Mamah ("Chika"); Eno Ettang ("Eno"); and Ma'at Olamide Arowora ("Olamide") (17 R. 156-58; Gov. Exs. 23-25). Atori and Chika took a taxi to Accra, where they stayed at a hotel for almost two weeks (17 R. 159-60). Papa, Olamide, and a man named Juve arrived at the hotel also (17 R. 160). Chika, Eno, and Juve swallowed drugs in the hotel (17 R. 161). Eno had swallowed 100 drug pellets (17 R. 161-62). The next day, Atori and Olamide swallowed drugs in the hotel (17 R. 160-61). Atori swallowed about 80 drug pellets (17 R. 161). She was to be paid $8,000 (17 R. 162).

Papa told Atori what address to write on the Customs declaration form – the same Angel Island Lane address as on Oboh's form for his December 2, 2001, trip (17 R. 162-63; 19 R. 149; Gov. Ex. 26). Atori and Olamide flew KLM flight 661 from Accra to Amsterdam to Houston, arriving September 10, 2001 (17 R. 165; 19 R. 148-49; Gov. Ex. 67). After clearing Customs in Houston, Atori and Olamide walked to the baggage claim, where Olamide used the restroom (17 R. 166-67). Sodik, whom Atori identified at trial as Kassim, met Atori in the baggage claim and asked for the other woman's whereabouts (17 R. 168-70). Atori explained that Olamide was in the restroom (17 R. 170). Olamide exited the restroom and stated she had passed all of her pellets in the bathroom, but had managed to re-ingest all but one of them (17 R.

14

167-68).  Atori chastised Olamide for not swallowing all of the pellets (17 R. 170).

Sodik was sympathetic to Olamide, calling her an "angel," and telling Atori not to be

so hard on Olamide (17 R. 170).  Sodik bought some water from an airport shop and

gave it to Olamide, who ingested the remaining pellet in a restroom (17 R. 171).  On

September 10, 2001, Atori, Olamide, and Sodik flew United flight 1182 from

Houston to Chicago (17 R. 171-72; 19 R. 149-50; Gov. Ex. 66).  The reservation was

made at the same time, and they sat in three consecutive seats: seats 12A, 12B, and

12C (19 R. 150-51).  In Chicago, Atori, Olamide, and Sodik took a taxi to Sodik's

apartment (17 R. 171-72).  Atori stayed at an apartment that belonged to a man named

Junior (Sydney Parker) who lived down the hall from Sodik's apartment (17 R. 172-

73; Gov. Ex. 27).  Atori passed the pellets at Junior's apartment, and a man named

Alhaji gave her $8,000 (17 R. 173).

Agent Tyler put a "lookout" on Atori as a "probable internal heroin smuggler"

(19 R. 151).  If she were to arrive in the country again, she would automatically be

referred to secondary inspection (19 R. 151).  On September 14, 2002, Atori was

arrested at JFK airport in New York after inspectors found heroin inside of her; she

later pleaded guilty to importing 754 grams of heroin (17 R. 148-49, 175, 187; 19 R.

151-52).[5]  Agent Tyler interviewed Atori in New York and reviewed her address book, which contained telephone numbers for Chika, Eno, and Yommy, and an email address for Olamide (17 R. 177-78; 19 R. 152-54; Gov. Ex. 28).

KLM's passenger list for flight 661 on September 9, 2001, showed that Chika flew from Accra to Houston Intercontinental (19 R. 154-55; Gov. Ex. 69). Southwest's PNR for September 9, 2001, showed that Sodik Adigun flew from Chicago Midway to Houston Hobby the morning that Chika arrived in Houston (19 R. 154-56; Gov. Ex. 69).  Agent Tyler subpoenaed Chika's U.S. passport application, which showed her passport was issued overseas in Lagos (19 R. 156-58; Gov. Ex. 70).  Agent Tyler also obtained Chika's later U.S. passport application, which showed the passport was issued in Chicago with the emergency contact of Sydney Parker at 3001 South Michigan (19 R. 158-59; Gov. Ex. 71).

The passenger list for KLM flight 661 arriving in Houston on September 11, 2001, the day the World Trade Center and Pentagon were attacked, showed that E. Ettang was on the flight, which normally arrived in Houston around 2:00 p.m., making it one of the last planes on the ground before all flights were temporarily suspended (19 R. 162-65; Gov. Ex. 72).  The passenger list for a Continental flight

---

[5] The third trip was for Yommy #1 (17 R. 175-77).  Atori swallowed the pellets in Lagos, and then flew from Nigeria to Paris to New York (17 R. 177).

from Houston to Chicago on September 17, 2001, showed that Eno Ettang and Yom Johnson were on the flight (19 R. 162-64; Gov. Ex. 72).

### 3. *Kazeem's Smuggling Trips*

Suliamon Oluwatoyin Kazeem was born in Houston, where his parents were attending college, but moved to Nigeria when he was 6.5 years old (17 R. 216-17). He had dual citizenship in the United States and Nigeria (17 R. 223). Kazeem met Papa in early 2001 at Papa's house (17 R. 222-23). Papa told Kazeem that he would earn $8,000 for his first trip (17 R. 223-24). Papa tested Kazeem's ability to swallow non-drug pellets; Kazeem swallowed over 90 pellets (17 R. 225). In late 2001, Papa called Kazeem for his first trip (17 R. 226). Kazeem traveled to Papa's house on Glover Street, where he stayed for a day or two, and then took a taxi to a hotel in Accra (17 R. 226-28). Lara and Bisi were at the hotel, and Oboh arrived later at the hotel (17 R. 228-31). After Oboh and Lara left the hotel, Kazeem and Bisi swallowed drug pellets (17 R. 232-33). Kazeem swallowed 98 pellets (17 R. 233). Papa gave Kazeem and Bisi $200 each, a phone, and an address for the Customs declaration form (17 R. 234, 236-37; Gov. Ex. 30).

Kazeem and Bisi flew KLM Airlines from Accra to Amsterdam to Houston, arriving December 3, 2001 (17 R. 236; 19 R. 134-36; Gov. Ex. 65). Kazeem's Customs declaration form for the flight had a Houston address on Will Clayton

Avenue (19 R. 137-38; Gov. Ex. 30). The Customs declaration forms for Bisi and Florence Martins had the same address (19 R. 138-39; Gov. Ex. 65). Agent Tyler determined the Will Clayton address did not exist (19 R. 139).

After clearing Customs in Houston, Kazeem and Bisi met a man who took them to buy tickets for a flight to Chicago (17 R. 237-39). United's passenger list for flight 736 from Houston to Chicago showed that Kazeem and Bisi sat next to each other in seats 18A and 18 B (19 R. 137). In Chicago, Sodik, whom Kazeem identified at trial as Kassim, picked up Kazeem and Bisi in his green SUV, in which Oboh was waiting (17 R. 240-42). Sodik took Oboh, Kazeem, and Bisi to an apartment (17 R. 243). Lara was already at the apartment (17 R. 244-45, 288). After two days, Kazeem passed his 98 pellets in the bathroom and gave them to Sodik, who paid him $8,000 (17 R. 244). Bisi also passed her pellets (17 R. 244). Kazeem was 19 years old; Bisi was 16 years old (17 R. 240). Kazeem had seen Oboite in Nigeria and again in Chicago (17 R. 235; Gov. Ex. 12). After passing the pellets, Kazeem stayed at the apartment for five to six weeks; in January 2002, Kazeem flew from Chicago to Lagos at Sodik's expense (17 R. 289-90).

Kazeem's second smuggling trip was in March 2002 (17 R. 250). Papa introduced Kazeem to Bolaji, whom Kazeem identified at trial as Aransiola (17 R. 252). Kazeem traveled to Papa's house, and from there took a taxi with Bolaji and

18

two men to the Crown Prince Hotel in Accra (17 R. 250-53). Bolaji brought drug pellets to Kazeem, who swallowed over 70 pellets in Bolaji's presence. Kazeem and Bolaji took a taxi to the airport; Bolaji had given Kazeem an address for the Customs declaration form and told him that someone would pick him up in Minnesota en route to Chicago (17 R. 255-56). Kazeem flew KLM/Northwest flight 41 from Accra to Amsterdam to Minneapolis, arriving March 25, 2002 (17 R. 256, 294; 19 R. 167-68; Gov. Ex. 86). Tokunbo eventually picked up Kazeem (17 R. 257-58; 18 R. 311-12; Gov. Ex. 48). Tokunbo purchased tickets for Kazeem and him to fly to Chicago, which they did (17 R. 259). The PNR for America Transair (ATA) flight TZ502 from Minneapolis to Chicago Midway on March 25, 2002, showed that Tokunbo and Kazeem traveled together on the flight (19 R. 167-69; Gov. Ex. 86).

In Chicago, Tokunbo and Kazeem took a taxi to an apartment, where Kazeem passed the pellets in the bathroom (17 R. 259). It took Kazeem about one day to pass the pellets, after which he was paid $9,000 (17 R. 259-60). Tokunbo's friend, Olumide Faleru ("Faleru"), was also at the apartment (17 R. 260). After the second trip, Kazeem obtained a new passport at Papa's instruction, even though his passport was still valid (17 R. 266-67).

On June 28, 2002, Kazeem was arrested in Washington D.C. Dulles Airport for importing 854 grams of heroin, and he later pleaded guilty (17 R. 218-19, 222,

19

268-70, 305; 19 R. 165).  This trip had nothing to do with Papa, Sodik, or Bolaji (17

R. 269).  Agent Tyler interviewed Kazeem and examined his address book, which

contained a land line telephone number for Papa that matched the number Oboh had

(19 R. 165-66).  The address book also contained addresses for  Accra hotels, and

phone numbers for Tokunbo and Faleru (17 R. 270-74).

### 4. *Oludare Adeyemi's Smuggling Trip*

Oludare Adeyemi was born in Brooklyn, New York, but moved to Nigeria

when he was 9 months old (17 R. 340-41).  His sister Olukemi was also born in the

United States (17 R. 341-42).  In 2001, the Adeyemis met Papa at Papa's house,

where Papa tested their ability to swallow non-drug pellets (17 R. 342-45).  Sometime

later, Papa called them for a real drug trip (17 R. 346).  The Adeyemis returned to

Papa's house and again were tested on swallowing (17 R. 346).  Oludare stayed at

Papa's house, but Olukemi stayed at a hotel, where a woman named "Fumi" (Oboite)

also stayed (17 R. 346-47; Gov. Ex. 12).  Oludare saw Oboite at Papa's house with

Oboh (17 R. 347-48).

In the end of February 2002, Bolaji, whom Oludare identified at trial as

Aransiola, took the Adeyemis via car to Bolaji's house, and the next morning to the

Shield Hotel in Accra (17 R. 348-50).   At another hotel in Accra, Bolaji gave the

Adeyemis the drug pellets, an address for the Customs declaration form, Tokunbo's

phone number, and airline tickets (17 R. 350-53). Oludare had met Tokunbo at Papa's house (17 R. 354; Gov. Ex. 4). Oludare wrote Tokunbo's phone number in his address book, which also contained Papa's phone number and Lara's e-mail address, (17 R. 354-55, 361; Gov. Ex. 37). After the Adeyemis swallowed the pellets, Bolaji took them to the airport (17 R. 353). The Adeyemis flew together on Northwest Airlines from Accra to Amsterdam to Minneapolis, arriving March 4, 2002 (17 R. 353; 19 R. 200-01; Gov. Ex. 85). The Adeyemis' flight coupons (airline tickets) were admitted at trial (19 R. 200-01; Gov. Ex. 85).

Tokunbo met the Adeyemis outside Customs in Minneapolis and purchased airline tickets for the three of them to Chicago (17 R. 355, 379; 18 R. 310). ATA's PNR showed that on March 4, 2002, the Adeyemis and Tokunbo flew flight 502 from Minneapolis to Chicago Midway (19 R. 201; Gov. Ex. 85). In Chicago, they took a taxi to Tokunbo's apartment, where the Adeyemis eventually passed the pellets (17 R. 356, 379). Tokunbo paid Oludare $7,000, and Olukemi $6,500 (17 R. 356). Faleru was also at the apartment when Oludare was passing pellets and when Oludare gave the pellets to Tokunbo (17 R. 357; Gov. Ex. 49).

The Adeyemis stayed at Tokunbo's apartment for about two weeks, and then returned to Nigeria (17 R. 358). Tokunbo gave them U.S. currency to give Papa, which they did (17 R. 358). In December 2002, Oludare applied for a new passport

because his was about to expire; Papa told him to use Papa's address on Glover Street as the permanent address, even though Oludare was not living there (17 R. 359-60).

    5. *Akar's Smuggling Trips*

    Eyako Akar, also called Katoz, was born in Buffalo, New York, where his parents were attending college (18 R. 5-6, 37). Akar lived in Buffalo for over six years before moving to Ghana (18 R. 6). Akar was in college when his friend introduced him to Bolaji, whom Akar identified at trial as Aransiola (18 R. 8-11). Bolaji looked at Akar's U.S. passport (18 R. 11-12). Akar was 23 years old at the time, but the photograph on his passport had been taken when he was 15 years old (18 R. 12). Akar renewed his passport at Bolaji's instruction (18 R. 12). Six months later, Akar again met Bolaji, who took him to meet Papa at Papa's house (18 R. 13-15). Bolaji told Akar that he would have to swallow ten-gram pellets (18 R. 16). Papa tested Akar with non-drug pellets; Akar swallowed about 70 (18 R. 16-17). When Papa was skeptical of Akar's ability to swallow real drug pellets, Akar and Bolaji both said Akar could do it (18 R. 17-18). Bolaji and Akar went to Bolaji's house in Lagos, where Akar stayed for two or three weeks (18 R. 18-19). During his stay at Bolaji's house, Akar saw a man, Isang Ettang ("Isang"), and a woman (18 R. 19-21; Gov. Ex. 43).

In October 2002, Bolaji told Akar it was time for the smuggling trip, and they took a bus to a motel in Accra (18 R. 21-23). Bolaji told Akar he would be paid between $8,000 and $10,000 for swallowing 100 drug pellets (18 R. 23, 27). Bolaji's friend Niyi brought 100 drug pellets to Akar's hotel room for Akar to swallow (18 R. 25-27). Bolaji arrived at Akar's hotel room about three or four hours later (18 R. 28). Over the course of one and one-half days, Akar managed to swallow 90 pellets (18 R. 27-28). Bolaji watched Akar swallow some pellets (18 R. 28). Because it took Akar so long to swallow the pellets, Bolaji and Akar went to the airport to reschedule Akar's flight (18 R. 29-30). Bolaji gave Papa's and his phone numbers to Akar, as well as an address to use on the Customs declaration form, $550, and some clothes (18 R. 32-33). Akar wrote down Papa's and Bolaji's phone numbers in his address book (18 R. 34-35; Gov. Ex. 41).

On October 21, 2002, Akar flew KLM from Accra to Amsterdam, where he connected to a Northwest flight to Washington Dulles, which arrived on October 22, 2002 (18 R. 36; 19 R. 177; Gov. Ex. 76). Akar passed about 10 pellets in the Amsterdam airport, and he flushed them down the toilet (18 R. 39). In Amsterdam, Akar called Papa, who told him that someone would meet him in Washington D.C. (18 R. 36). Faleru was waiting for Akar at Dulles Airport (18 R. 36-38; Gov. Ex. 49). Faleru had flown alone on October 22, 2002, on Southwest flight 380 from Chicago

23

Midway to BWI (19 R. 177; Gov. Ex. 76). Faleru and Akar took a taxi from Dulles

to BWI, where they took Southwest flight 872 to Chicago Midway (18 R. 38-39; 19

R. 177-78; Gov. Ex. 76). After Agent Tyler received the records regarding Akar's

flights, he flagged Akar in the system (19 R. 178).

In Chicago, Faleru took Akar to an apartment, where Akar passed the pellets

after six days; Akar gave the pellets to Tokunbo (18 R. 40-41). Tokunbo paid Akar

a total of $6,500 for the trip (18 R. 41-43). Akar saw another smuggler at the

apartment; his name was Jaiye (18 R. 45-46). Tokunbo, Faleru, Jaiye, and Akar

moved to another apartment in Chicago at 2605 South Indiana Avenue (18 R. 48-51).

Bolaji came to the apartment and stayed there with them (18 R. 53-54). After

Thanksgiving 2002, Akar had lived in Chicago for a total of about one month, and

moved to New York (18 R. 51-53). Akar repeatedly called Tokunbo, who still owed

him $700 (18 R. 52). In February 2003, Akar returned to Chicago to get his money

from Tokunbo and ended up staying at the South Indiana apartment for four or five

months (18 R. 55-56, 63). During Akar's stay at the apartment, three additional drug

smugglers arrived at various times and stayed various lengths of time at the

apartment; they were Olumide Agbola, Datubo Brice George, and Kenneth Nwanze

(18 R. 56-61; Gov. Exs. 44-46). Bolaji was still at the apartment when the three

smugglers arrived (18 R. 60-62). Either Faleru or Tokunbo picked up the smugglers

at the airport (18 R. 67).  Akar never obtained his money from Tokunbo (18 R. 62).

Akar told Bolaji that he wanted his money, but Bolaji told him to do another trip (18

R. 62-63).

In late February or early March 2003, Akar took a bus from Chicago to New

York at Tokunbo's expense to apply for a visa from the Ghanaian Embassy (18 R. 63-

65).  After one day in New York, Akar returned to the Chicago apartment on South

Indiana (18 R. 64-65).  Bolaji, Tokunbo, Faleru, and Jaiye were still at the apartment

(18 R. 65).  During the course of Akar's four- to five-month stay at the apartment, he

saw a black bag of heroin pellets in the bathroom or in the bedroom that Bolaji and

Tokunbo shared (18 R. 65-66).  According to Akar, Bolaji was in charge of everyone,

including Tokunbo, Faleru, Jaiye, and the three smugglers who arrived later (Agbola,

George, and Nwanze) (18 R. 68-69).  Bolaji "was always giving the orders, like he

was telling them where to go and what to do" (18 R. 69).  In June 2003, Akar, Bolaji,

Tokunbo, Faleru, and Jaiye all moved to another Chicago apartment at 3440 South

Cottage Grove (18 R. 70-72).  In July 2003, Akar traveled to New York to pick up his

visa, and flew from New York to London Heathrow to Ghana on a round trip ticket

Bolaji had purchased in Chicago (18 R. 69-70, 72-74).

An unknown person picked up Akar in Ghana and took him to a place, where

he stayed for one and one-half weeks (18 R. 74-75).  Akar called Bolaji and Tokunbo

a "couple of times" (18 R. 75). Bolaji told Akar a man would bring him the drug pellets when Akar was about to leave, and that either Faleru or Tokunbo would pick him up in New York (18 R. 75, 78). A man brought Akar the pellets, and Akar swallowed 100 of them (18 R. 76-77). Akar flew British Airways from Accra to London Heathrow to JFK, where he was arrested on August 6, 2003, for attempting to smuggle heroin into the United States; he later pleaded guilty to the crime (18 R. 6-7, 78-79; 19 R. 178-80; Gov. Ex. 77). Agent Tyler took custody of the drugs in Akar's body (19 R. 181). The DEA lab report showed that Akar had 987.7 grams net weight of heroin (19 R. 181; Gov. Ex. 80).

Agents on surveillance at JFK followed Faleru from JFK to a La Quinta hotel near the airport (19 R. 182). The hotel records showed that Faleru checked into the hotel for one night on August 6, 2003, and that his address was 5817 North Kenmore Avenue (19 R. 183-84; Gov. Ex. 78). The hotel records contained a copy of Faleru's Illinois driver's license, which also reflected the North Kenmore address (19 R. 184; Gov. Ex. 78). ATA records showed that Faleru flew from Chicago Midway to New York La Guardia on August 6, 2003, and the next day, he alone flew back to Midway (19 R. 179-80; Gov. Ex. 77).

6.  *George's Smuggling Trips*

Datubo Brice George was born in Florida, where his father was attending college, but moved to Nigeria when he was six months old (18 R. 156-57).  George had a U.S. passport (18 R. 160).  When George was in college in Nigeria, two of his friends introduced him to a man named Lati for the purpose of smuggling drugs into the United States (18 R. 158-59).  In February 2003, George and Niyi took a taxi from Lagos to the Crown Prince Hotel in Accra (18 R. 160-61).  George stayed in the hotel for two or three weeks, during which time a man named Layi and another man arrived at the room and passed drug pellets in the bathroom (18 R. 161-62).  They told George that the pellets contained "gold dust" (18 R. 163).  In March 2003, George swallowed 80 pellets (18 R. 165, 213).  Layi and a man named Sheena left to purchase George's airline ticket from Accra to Amsterdam to Houston (18 R. 163).  They gave George a Houston address to put on his Customs declaration form (18 R. 164-65; Gov. Ex. 47).  Sheena gave George clothes and a gold pendant to give to B.J. (Bolaji) (18 R. 166, 170).

A KLM PNR showed that George flew flight 90 from Accra to Amsterdam on March 8, 2003, and then connected to flight 661 arriving in Houston on March 9, 2003 (19 R. 208; Gov. Ex. 90).  At Houston Intercontinental, Tokunbo picked up George, and they took a taxi, at Tokunbo's expense, to Houston Hobby, where

27

Tokunbo paid cash for two tickets on Southwest flight 2419 to Chicago Midway (18 R. 167-69, 314-16; 19 R. 208-09; Gov. Exs. 48 & 90). Tokunbo had flown alone earlier on March 9, 2003, from Chicago Midway to Houston Hobby on flight 2203 (19 R. 208; Gov. Ex. 90). In Chicago, Tokunbo and George were picked up by B.J. (Bolaji) and Faleru in Tokunbo's gold Nissan Maxima; they went to the apartment at 2605 South Indiana (18 R. 169-71, 316; Gov. Ex. 49). George gave the gold pendant to Bolaji (18 R. 171).

George stayed at the apartment with Tokunbo, Faleru, and Bolaji, whom George identified at trial as Aransiola (18 R. 170-72).[6] Other smugglers, Akar, Jaiye Dania, and Ayodele Simpson, were already at the apartment (18 R. 177-80; Gov. Exs. 42, 50-51). George passed his pellets in the bathroom and gave them to Tokunbo, at Bolaji's direction (18 R. 173).[7] Tokunbo broke open the pellets (18 R. 174). Bolaji, Tokunbo, Faleru, and George referred to the pellets as "gbana," meaning drugs (18 R. 174-75). George was paid $300, much less than expected, but he often saw Bolaji, Tokunbo, and Faleru count large sums of money (18 R. 175-77).

---

[6] George identified the defendant wearing a brown suit and sitting at table two as Bolaji (18 R. 170-71). On the same day, Akar, Tokunbo, and Faleru identified the same defendant as Bolaji, and the record expressly reflects they identified Aransiola (18 R. 10-11, 284, 404-05).

[7] George had passed two pellets in the bathroom on the flight from Amsterdam to Houston, but did not recover them (18 R. 172-73).

During George's stay in Chicago, Tokunbo and Faleru flew to other cities to pickup smugglers and returned with them to Chicago; they also spoke on the phone with Papa and Lati (18 R. 180-82). Bolaji, Faleru, and Tokunbo went on a smuggling trip with Akar (18 R. 190). Bolaji asked a pastor in Nigeria to pray for the smugglers' safe passage (18 R. 182-83). Bolaji sent money to the pastor and to Lati, so that another person could smuggle drugs (18 R. 184-85). George saw Faleru and Tokunbo send money via Western Union so that others could smuggle drugs (18 R. 185-86). At some point during his stay in Chicago, George and the others moved to 3440 South Cottage Grove (18 R. 186). Bolaji, Tokunbo, and Jaiye moved from South Cottage Grove to 2951 King Drive, also in Chicago (18 R. 188-89).

George called Lati inquiring about his money; Lati said he would not be paid unless he did another trip (18 R. 197). After speaking with Bolaji, Lati told George that he would receive $13,500 for the two trips (18 R. 198, 217-18). In August 2003, Tokunbo took George to the train station; George took the train to the airport and returned to Nigeria at Bolaji's expense (18 R. 175, 190-91). Bolaji had given George $600, $200 for George and the rest for Lati in Nigeria (18 R. 191). Lati picked up George in Nigeria, where he stayed for about three weeks (18 R. 192).

In October 2003, Lati gave George about 80 pellets, which George swallowed (18 R. 192-93). George flew World Airways flight 817 from Nigeria to JFK, arriving

October 19, 2003 (18 R. 192-93; 19 R. 194-95; Gov. Ex. 82). Another smuggler, Oluwadamilola Eddo, was on George's flight (18 R. 194; 19 R. 195; Gov. Exs. 34, 82). After George cleared Customs at JFK Airport, he met Faleru who was waiting for George and Eddo (18 R. 195-96). After 15 minutes of waiting for Eddo, who never appeared, Faleru and George took a taxi, at Faleru's expense, to New York La Guardia and flew ATA flight 215 to Chicago Midway, also at Faleru's expense (18 R. 195-97; 19 R. 195-96; Gov. Ex. 82). In Chicago, Faleru and George took a taxi to the South Cottage Grove apartment; Bolaji, Tokunbo, and Jaiye were at the apartment (18 R. 198-99). George passed the pellets and gave them to Tokunbo, who paid him $9,000 (18 R. 241).

Bolaji, Faleru, and Tokunbo asked George about Eddo (18 R. 199-200). The next day, after being detained by Customs, Eddo called Tokunbo at the apartment; Tokunbo, Bolaji, and Faleru were nervous that Eddo would lead the police to them (18 R. 200-01, 203). Eddo flew alone from New York La Guardia to Chicago Midway on October 20, 2003 (10 R. 196; Gov. Ex. 82). Tokunbo and George picked up Eddo from the airport in Tokunbo's Nissan Maxima (18 R. 201-02). They took Eddo to a hotel, where Eddo passed his pellets and gave them to Tokunbo, who paid Eddo (18 R. 201-02).

7. *Tokunbo*

Tokunbo was born in Nebraska, but moved to Nigeria when he was two years old (18 R. 267).  In November 2003, Tokunbo was arrested for heroin trafficking and he later pleaded guilty before Judge Atlas (18 R. 267-68).  In 2001, Tokunbo met Papa at Papa's house on Glover Street (18 R. 268-70).  Papa looked at Tokunbo's U.S. passport (18 R. 270).  Papa tested Tokunbo's ability to swallow pellets; Tokunbo swallowed 80 pellets on his third test (18 R. 271-72).  Faleru, Tokunbo's friend from high school, told Tokunbo how Papa worked (18 R. 272-74).

Tokunbo and Faleru went to Papa's house, and Papa told Faleru to swallow drug pellets (18 R. 274-75).  Tokunbo, Faleru, Papa, and one of Papa's men rode in Papa's hired car to a hotel in Ghana (18 R. 275).  After two days in the hotel, Faleru passed the drug pellets (18 R. 276).  Faleru later swallowed about 100 or more drug pellets and departed on a Tuesday (18 R. 276-77).  Tokunbo swallowed 70 drug pellets and departed on a Thursday (18 R. 277).  Papa and Tokunbo took a taxi from the hotel to the airport, but KLM Airlines refused to let Tokunbo fly to Houston (18 R. 278).  Papa and Tokunbo returned to the hotel (18 R. 278).  Tokunbo first met Bolaji at the hotel when Bolaji, whom Tokunbo identified at trial as Aransiola, inquired about why Tokunbo could not fly (18 R. 284, 340-41).  The next morning,

31

Papa and Tokunbo returned to Lagos, where Tokunbo passed the drugs and gave
them to Papa (18 R. 279).

For three weeks, Tokunbo stayed with a man who worked for Papa, and then
Papa called for another trip (18 R. 279-80). Tokunbo went to Papa's house on Glover
Street, and Tunde took Tokunbo to the Avenida Hotel in Accra (18 R. 279-81).
Tunde and Tokunbo went to the Accra Airport for a ticket to Houston, but KLM
again said Tokunbo could not fly (18 R. 281). Tunde called Papa, who instructed
them to return to Lagos (18 R. 282). In Lagos, Papa told Tokunbo he was not going
to use him to smuggle drugs (18 R. 282). A week later, Papa called Tokunbo and told
him Bolaji could use him (18 R. 282-83). Tokunbo met Papa and Bolaji at Papa's
house, and Bolaji took Tokunbo to Bolaji's house (18 R. 283, 285).

After Tokunbo stayed at Bolaji's house for a week, they traveled to a hotel in
Accra (18 R. 285-86). The next day, Tokunbo and Bolaji went to the airport and
booked a flight for three days later on Alitalia Airlines from Accra to Milan to
Chicago; Bolaji paid for the ticket (18 R. 286-88). On the day of the flight, Bolaji
brought Tokunbo drug pellets; Tokunbo swallowed 100 pellets (18 R. 287-88).
Bolaji gave Tokunbo $200, and told him that if Immigration stops him in Ghana, he
should tell them that his parents had separated, that he was visiting his mother who
lived in Ghana, and that his mother bought the ticket for him to Chicago (18 R. 288).

32

A border-crossing record showed that Tokunbo arrived at Chicago O'Hare on Alitalia flight 626 on April 15, 2001 (19 R. 197; Gov. Ex. 83).

In Chicago, Tokunbo went to a Comfort Inn, as Bolaji had instructed; a man named Kunle and a woman greeted Tokunbo and mentioned Bolaji (18 R. 289-90). The couple took Tokunbo to their apartment, where Tokunbo passed the pellets (18 R. 290). Tokunbo was paid $10,500 (18 R. 290). Tokunbo stayed at the apartment for three weeks before he returned to Lagos (18 R. 291). In Lagos, Tokunbo stayed with Faleru, who introduced him to Omotayo Ayoade, another smuggler, whom Tokunbo had seen at Papa's house (18 R. 292-93; Gov. Ex. 52). Tokunbo and Ayoade talked about smuggling (18 R. 293).

Bolaji had told Tokunbo to contact him three months after the first trip for another trip, which Tokunbo did (18 R. 293-94). The three-month lapse was so that the trips would not be too obvious to Immigration or Customs (18 R. 294). Before the next trip, Bolaji suggested that Tokunbo invest his money in the drugs (18 R. 294). Tokunbo gave Bolaji $1,000 for 50 grams, which was five or six pellets (18 R. 294-95). A couple of weeks later, Tokunbo and Bolaji went to a hotel in Accra, where Tokunbo swallowed about 100 drug pellets brought by Bolaji (18 R. 295-96). Tokunbo flew KLM Airlines from Accra to Amsterdam to Chicago (18 R. 296-97; 19 R. 198; Gov. Ex. 84). Tokunbo went to the same Comfort Inn he had gone before,

33

checked into the hotel, and called Bolaji (18 R. 297). Kunle picked up Tokunbo and took him to the woman's apartment, which was a different apartment from the prior trip (18 R. 297-98). Tokunbo passed the pellets, and was paid $14,000 (18 R. 298). Part of the payment was from his investment ($3,500), the remainder was for carrying the other drug pellets (18 R. 298).

Tokunbo stayed in the apartment for three weeks, and then stayed with Sydney Parker, also known as Waheed (18 R. 298-99). During his month-long stay with Parker, Tokunbo saw Chika, another smuggler, at the apartment, and talked to Bolaji "a couple of times" (18 R. 299-300). After some weeks, Parker and Tokunbo moved to 1016 West Hollywood, where Tokunbo stayed for three months (18 R. 300). Tokunbo invested $2,000 in 100 grams of heroin; he gave the money to Parker, who said he was going to send it via Western Union (18 R. 300-01). Parker picked up Faleru at the airport and brought him back to the apartment, where Faleru passed the pellets (18 R. 302). Tokunbo earned money on his investment from the drugs Faleru brought (18 R. 301). After Tokunbo's three-month stay at the West Hollywood apartment, he returned to Lagos for his third smuggling trip, which did not involve Papa or Bolaji (18 R. 303-05).

When Tokunbo returned to the West Hollywood apartment, Faleru was still there (18 R. 306). Papa asked Tokunbo and Faleru to help pick up drug couriers at

34

the airport when they arrived in the United States; they agreed and also agreed to invest in the drugs (18 R. 306-07). A week before the drug courier left Ghana, Tokunbo and Faleru sent Papa about $3,500 to $4,000 via Western Union to invest in the drugs (18 R. 307-08). The most Tokunbo invested was $3,000 for 150 grams (18 R. 351). If Tokunbo had not invested in a trip, Papa would pay him $1,000 for picking up the drug courier (18 R. 350-51). Papa would call Tokunbo and Faleru to let them know when the drug couriers left Accra, when they would arrive, and what they were wearing (18 R. 308).

At Papa's direction, Tokunbo picked up Michael "Ayo" Ajidahun and a girl named Olamide in Houston (18 R. 307-08, 332-33; Gov. Ex. 25).[8] KLM's passenger list confirmed that Ajidahun and Olamide had flown on KLM flight 661 from Accra to Amsterdam to Houston on February 4, 2002 (19 R. 145-46; Gov. Ex. 66). Tokunbo paid for Southwest airline tickets for the three of them to Chicago, where Ajidahun and Olamide passed pellets (18 R. 309; 19 R. 146-47). Southwest's PNR confirmed the three tickets were booked at the same time (19 R. 147). Papa had instructed Tokunbo to give the pellets to Bobby (18 R. 309). A week or two later,

---

[8] At some point in the investigation, Agent Tyler learned that Ajidahun had been arrested at the Minneapolis airport (19 R. 140-41). Agent Tyler interviewed Ajidahun, who had the same land line telephone number for Papa as Oboh (19 R. 141-43).

Bobby returned with money (18 R. 309). Tokunbo made money on his "investment" (18 R. 309).

Tokunbo's next pickup was the Adeyemis in Minnesota (18 R. 310). Tokunbo brought the Adeyemis to his apartment in Chicago, where the Adeyemis passed the drugs, which Tokunbo gave to Bobby (18 R. 310). Tokunbo and Faleru had invested in that trip as well (18 R. 310). Six or seven weeks later, Tokunbo picked up Kazeem in Minnesota and brought him to Chicago to 1225 West Greenleaf (18 R. 311-12). Kazeem passed the pellets, which Tokunbo gave to Bobby (18 R. 312). Tokunbo made money off this investment (18 R. 312-13). A couple of days later, Tokunbo picked up Eddo in Minnesota and took him to the Greenleaf apartment, where Tokunbo paid Eddo for the drugs he carried (18 R. 313-14; Gov. Ex. 34). A Northwest PNR showed that Eddo flew from Accra to Amsterdam to Minneapolis, arriving March 30, 2002 (19 R. 202; Gov. Ex. 88). Eddo's flight coupon was admitted at trial (19 R. 203; Gov. 88).

In early 2003, Tokunbo picked up George in Houston (18 R. 314-16; Gov. Ex. 45). Tokunbo had never met George, but Bolaji had told Tokunbo what George was wearing (18 R. 315). Tokunbo took George to the South Indiana apartment, where Tokunbo, Faleru, Bolaji, and Akar were all living and where Tokunbo and Bolaji shared a bedroom (18 R. 316-19, 374; Gov. Exs. 54-55). Tokunbo picked up Jaiye

Dania, a drug courier, at Papa's direction (18 R. 332; Gov. Ex. 42). A Southwest PNR showed that Tokunbo flew alone on flight 2140 from Chicago Midway to BWI on October 27, 2002 (19 R. 209; Gov. Ex. 91). An ATA PNR showed that Tokunbo and Dania flew flight 297 on October 28, 2002, from Washington National to Chicago Midway (19 R. 210; Gov. Ex. 91). Dania had arrived at Washington Dulles on Northwest flight 35 from Amsterdam (19 R. 210; Gov. Ex. 91).

Bolaji, who was in Ghana, told Tokunbo to pick up Isang, a drug courier, in Washington D.C. (18 R. 331; Gov. Ex. 43). Isang flew Northwest flight 35 from Amsterdam to Washington Dulles, arriving November 3, 2002 (19 R. 203-04; Gov. Ex. 89). The Customs inspectors noted Isang's eyes were bloodshot and he acted strangely, and wondered whether he actually was a U.S. citizen (19 R. 204; Gov. Ex. 89). Isang was detained, but not arrested (19 R. 204). A Southwest PNR showed that Tokunbo flew alone on flight 402 from Chicago Midway to BWI on November 3, 2002 (19 R. 205; Gov. Ex. 89). The flight was booked the previous day and paid in cash (19 R. 205; Gov. Ex. 89). Tokunbo flew alone on Southwest flight 764 from BWI to Chicago Midway on November 4, 2002 (19 R. 205-06; Gov. Ex. 89). Another Southwest PNR showed that Tokunbo flew alone on flight 2366 from Chicago Midway to BWI on November 7, 2002 (19 R. 206; Gov. Ex. 89). The flight was booked on November 7, 2002, along with a return flight the next day (19 R. 206-

37

07; Gov. Ex. 89). Isang and Tokunbo flew Southwest flight 741 from BWI to Chicago Midway on November 8, 2002 (19 R. 206-07; Gov. Ex. 89).

Tokunbo met Agbola, a drug courier, at Papa's house (18 R. 332; Gov. Ex. 44). Agbola arrived at Houston Intercontinental on July 23, 2001, on KLM flight 661 from Accra via Amsterdam (19 R. 184-85, 191-92; Gov. Ex. 81). Agbola's passport number showed that it had been issued overseas (19 R. 185). Agbola's Customs declaration form had a Houston address at 15910 Ashaton Hills (19 R. 186, 193-94; Gov. Ex. 81). Southwest's records showed that on July 23, 2001, Sodik Adigun flew flight 1546 from Chicago Midway to Houston Hobby (19 R. 186-87, 192-93; Gov. Ex. 81). Southwest's records also showed that on July 23, 2001, Sodik Adigun and Agbola flew together on flight 371 from Houston Hobby to Chicago Midway (19 R. 193; Gov. Ex. 81). The reservations were made at the same time (19 R. 193).

Tokunbo invested in all the loads of the smugglers he picked up (18 R. 319). In the 2.5 years that Tokunbo invested in heroin, he earned about $70,000 (18 R. 330-31). After Bolaji moved into the apartment in November 2002, he paid Tokunbo for his investments (18 R. 331).

Bolaji also invested in the loads (18 R. 319). Bolaji was in charge; he told Tokunbo and the others what to do, such as when and where to pick up the drug couriers and deliver drugs (18 R. 320). Either Papa or Bolaji instructed on picking

38

up the drug couriers (18 R. 325). When the couriers passed their pellets, the courier gave the pellets to Tokunbo, Faleru, or Bolaji, who cut the heroin out of the pellet with a blade (18 R. 323). With the help of a scale, they put 100 grams of heroin in a sandwich bag (18 R. 323-24).

After Tokunbo's second smuggling trip, he saw Kassim at the apartment in Chicago and gave him a sandwich bag of drugs (18 R. 372-75). When Bobby needed the drugs, he called Tokunbo or Faleru, who took it to Bobby (18 R. 324). Bobby paid Tokunbo or Faleru, who in turn gave the money to Bolaji, who sent some of the money to Nigeria via Western Union (18 R. 324-25). Bolaji, Tokunbo, and Faleru placed money in, and took money from, a bag (18 R. 374-75).

8. *Faleru*

Faleru was born in West Virginia, but moved to Nigeria when he was three years old (18 R. 386). He started smuggling drugs in early 2001 (18 R. 387-88). Faleru met Papa at Papa's house on Glover Street (18 R. 389). Papa tested Faleru's ability to swallow pellets, but Faleru could only swallow 20 of the 50 pellets (18 R. 390). Papa looked at Faleru's U.S. passport (18 R. 391). A few weeks later, Faleru passed his second swallowing test (18 R. 392).

In February 2001, Faleru made his first smuggling trip (18 R. 393). Papa and Faleru took a car and driver from Lagos to the President Hotel in Accra (18 R. 394-

95).  Tokunbo was also in the car (18 R. 409-11).  Faleru stayed at the hotel for a

week, during which time Papa brought him some pellets (18 R. 395).  Faleru

swallowed about 60 drug pellets in four or five hours (18 R. 396).  Papa and Faleru

took a taxi to the airport to obtain a visa for Faleru and to obtain his boarding pass (18

R. 397).  Papa gave Faleru the round trip ticket and Faleru obtained the boarding pass

(18 R. 398-99).  Papa gave Faleru $200 and an address for the Customs declaration

form and told Faleru to tell Immigration that he was on vacation (18 R. 399, 401).

Faleru flew KLM from Accra to Amsterdam to Houston, arriving February 21, 2001

(18 R. 399; 19 R. 170-72; Gov. Ex. 73).

Sodik, whom Faleru identified at trial as Kassim, greeted Faleru in Houston (18

R. 400-01).  Sodik had flown from Chicago to Houston earlier on February 21, 2001,

on a flight booked the previous day (19 R. 170-72; Gov. Ex. 73).  Using Faleru's

$200, Sodik purchased airline tickets to Chicago (18 R. 401).  An American Airlines

PNR showed that Sodik Adigun and Faleru flew together from Houston to Chicago

on February 21, 2001 (19 R. 170-72; Gov. Ex. 73).

In Chicago, Sodik and Faleru went to Sodik's apartment at 5750 North

Kenmore, where Faleru passed the pellets in the bathroom (18 R. 402).  Faleru

washed the pellets and gave them to Sodik (18 R. 403).  A couple of days later, Faleru

saw Sodik use a blade to cut the pellets, which contained heroin (18 R. 403).  Using

40

a scale, Sodik put the heroin in a sandwich bag (18 R. 403, 405). Bolaji, whom Faleru identified at trial as Aransiola, had taught Faleru how to do the same thing (18 R. 404-05). Sodik paid Faleru $2,000; Sodik said that Papa would pay the rest in Lagos (18 R. 405). Papa later paid Faleru $8,000 (19 R. 66). Faleru stayed at Sodik's apartment for three weeks (18 R. 406).

In March 2001, Faleru flew back to Ghana on the return portion of his round trip ticket, and took another flight to Nigeria (18 R. 406-07). Papa paid Faleru $8,900 (18 R. 408). Weeks later, Papa called Faleru for another trip; Faleru went with Tokunbo to Papa's house on Glover Street (18 R. 407-09). Papa, Faleru, Tokunbo, and two of Papa's men took a car to the President Hotel in Accra (18 R. 411). Tokunbo had stayed with Faleru in the hotel on the first trip, but not on this trip (18 R 411-12). Faleru saw another smuggler, Tayo Ayoade, at the hotel (18 R. 413; Gov. Ex. 52). Papa told Faleru that Ayoade was one of his drug smugglers (18 R. 413). Ayoade left the hotel two days before Faleru (18 R. 415).

In April 2001, Papa brought Faleru drug pellets to swallow; Faleru swallowed more than 50 pellets (18 R. 414; 19 R. 5). Papa gave Faleru an address for his Customs declaration form and took Faleru to the airport (18 R. 414). Faleru flew KLM from Accra to Amsterdam to Houston, arriving April 13, 2001 (18 R. 415; 19 R. 173; Gov. Ex. 74). Sodik was waiting for Faleru in Houston (18 R. 415). On

41

April 13, 2001, Sodik and Faleru flew United flight 1448 from Houston to Chicago O'Hare on tickets purchased by Sodik (19 R. 5, 173-74; Gov. Ex. 74). In Chicago, they took a taxi to Sodik's apartment at 5750 North Kenmore, where Faleru stayed for about one month (19 R. 5-6, 76). As with the prior trip, Faleru passed the pellets and gave them to Sodik (19 R. 6). Two months later, Sodik paid Faleru $10,000 (19 R. 7).

While at Sodik's apartment, Faleru saw Parker (19 R. 7). At some point, Faleru returned to Nigeria, and on November 29, 2001, he returned to Chicago, but to the apartment at 3016 West Hollywood (19 R. 9). Faleru stayed at the West Hollywood address for about seven months; he lived with Tokunbo and Kizito (19 R. 10-11; Gov. Ex. 33). Faleru, Tokunbo, and Kizito moved to another apartment in Chicago at 1225 West Greenleaf and then eventually back to North Kenmore (19 R. 12). In December 2002, they moved to an apartment at 2605 South Indiana Avenue (19 R. 12-13). Bolaji moved in to the apartment about three weeks later (19 R. 13-14). Faleru previously had seen Bolaji a couple of times in Lagos at Bolaji's house and also at Papa's house on Glover Street (19 R. 14-15). While in Chicago, Tokunbo drove a gold Nissan Maxima, Bolaji drove a white Mercedes-Benz, and Sodik drove a Toyota Camry (19 R. 15-16, 39).

Before Bolaji lived at the South Indiana apartment, he was in Ghana sending the heroin couriers to Chicago (19 R. 25). While living with Tokunbo and Bolaji, Faleru picked up drug couriers at various U.S. airports and brought them to the Chicago apartment (19 R. 16). While living at the North Kenmore apartment, Faleru picked up Akar and Jaiye Dania (19 R. 24-25; Gov. Exs. 42, 50). In mid-2003, Faleru traveled to New York to pick up Akar at JFK Airport, but Akar did not show (19 R. 29-30). While living at 2605 South Indiana, Tokunbo picked up Iyot Simpson (19 R. 24-25, 30-31; Gov. Ex. 51). Faleru picked up George at JFK Airport (19 R. 30-31; Gov. Ex. 45).

Faleru picked up Nwanze, a heroin courier, at a U.S. airport outside Chicago and brought him back to Chicago (19 R. 16-18; Gov. Ex. 46). Faleru had never met Nwanze, but Bolaji had given Nwanze's description to Faleru (19 R. 17-18). Nwanze passed the pellets at the South Indiana apartment (19 R. 24). The PNR for a KLM flight on February 9, 2003, from Accra to Amsterdam to Houston, arriving February 10, 2003, showed that Nwanze was on the flight (19 R. 174-75; Gov. Ex. 75). Nwanze's Customs declaration form had the same Angel Island Lane address as on Oboh's and Atori's forms (19 R. 174; Gov. Exs. 6, 26, 75). Southwest's records showed that Faleru flew alone from Chicago Midway to Houston Hobby on February 9, 2003 (19 R. 175; Gov. Ex. 75). Southwest's records also showed that Faleru and

Nwanze flew together on flight 2419 from Houston Hobby to Chicago Midway on February 10, 2003 (19 R. 175-76; Gov. Ex. 75).

Faleru picked up Akar at Washington Dulles (19 R. 26, 28). Faleru had never met Akar, but Bolaji had given Akar's description to Tokunbo who gave it to Faleru (19 R. 28-30). After Akar passed the pellets, Faleru and Tokunbo removed the heroin from the pellets with a blade and put about 10 pellets in a sandwich bag (19 R. 34). Faleru and Tokunbo weighed the sandwich bag on a scale in the apartment (19 R. 35). Faleru had seen Bolaji weigh the drugs with the scale (19 R. 35). In fact, Bolaji had taught them how to remove the heroin from the pellets and put it in the sandwich bags (19 R. 34). Bolaji told Faleru and Tokunbo when to remove the heroin and where to keep it (19 R. 37-39). The heroin was kept in a locked small hand luggage bag in the apartment (19 R. 38). Bolaji, Faleru, and Tokunbo had the combination to the lock (19 R. 38). Faleru was present when Tokunbo would give the drugs to Oriyomi or Bobby (19 R. 36).

When Faleru and Tokunbo picked up the couriers at airports outside of Chicago, they always used cash to purchase their tickets to and from Chicago (19 R. 33). They kept cash in the apartment in a bag (19 R. 33). Bolaji put money in the bag and took money out of it (19 R. 33). Faleru and Tokunbo sometimes went into the bag at Bolaji's direction (19 R. 33-34, 47-48).

44

Faleru invested the money he earned from being a heroin courier in the drug business (19 R. 18). Faleru sent money to Papa in Nigeria via Western Union (19 R. 19). With Nwanze's trip, Faleru paid Papa $2,500 via Western Union and invested in 100 grams of heroin, which was about 10 pellets; Tokunbo invested in about 150 grams, and Bolaji invested in about 300 grams (19 R. 19-22). Iyot Simpson also stayed at the South Indiana apartment and invested in the drugs (19 R. 21). Western Union would not allow more than $2,500 to be sent at one time, so Faleru would send a number of different Western Union transfers to Papa (19 R. 22). Papa contacted the people in the apartment by calling Bolaji's cellular phone; Papa would talk to Bolaji (19 R. 20-21, 23). Bolaji gave money to Faleru and Tokunbo to send to Papa via Western Unition (19 R. 22-23). When Faleru was arrested in November 2003, he had $10,000 cash in drug money that Tokunbo had given him to purchase money orders for Bolaji (19 R. 52-54).

Bolaji, Tokunbo, Faleru, and Simpson were essentially partners in the drug business, but Bolaji had a higher rank among them; Bolaji "was the one controlling everything" and "[g]iving the orders" (19 R. 23). Bolaji was the one who spoke to Papa and told the others when to go and what to bring to Western Union (19 R. 23-24). Faleru did not put his money in a bank account because "it's drug money" (19 R. 27). Tokunbo did not have a bank account either, and Faleru never saw Bolaji put

45

his money in a bank (19 R. 27-28).  Agent Tyler testified the last flight in the conspiracy arrived in New York on January 24, 2004 (19 R. 224).

### 9. *Additional Evidence Implicating Aransiola and Kassim*

The first time Agent Tyler saw Aransiola's name was on a lease for the South Indiana apartment where Tokunbo and Faleru were living; the lease included a copy of Aransiola's Nigerian passport (19 R. 219).  After Agent Tyler saw Aransiola's name on the lease renewal, which corresponded with the time Bolaji moved into the apartment with Tokunbo, Faleru, and Akar, Agent Tyler requested Aransiola's visa photograph from the State Department (19 R. 219-20).[9]  After interviewing Akar, Agent Tyler learned Aransiola and Bolaji were the same person (19 R. 219).

On September 30, 2003, ICE Agent Nicodemus and other agents knocked on the door of a Chicago apartment at 4933 North Kedze (18 R. 244-45).[10]  A woman, Otenigeagee Obiodum, answered the door and allowed the agents to enter the apartment (18 R. 246).  The agents found a locked suitcase, which Obiodum's sister, Adunola Ajayi, agreed to let the agents open (18 R. 246-47).  The suitcase contained an Illinois state identification card for Sodik T. Adigun, whom Agent Nicodemus

---

[9] Aransiola, who is not a U.S. citizen, had flown from Accra to New York on November 22, 2002 (19 R. 217; Gov. Ex. 94).

[10] The agents were not investigating this heroin smuggling ring (18 R. 255).

46

identified at trial as Kassim, and a jewelry receipt made out to Kassim (18 R. 247-49; Gov. Exs. 58-59). On November 24 2003, Kassim was arrested in Chicago at 6954 North Sheridan; Ajayi was present during the arrest (18 R. 249-50).[11] Agent Tyler obtained a copy of the lease application, lease, and lease renewal for 6954 North Sheridan (19 R. 221). The apartment was leased to Onimole Bose Adedoyin with Sodik listed as the nearest relative and a telephone number; another telephone number that appeared on the lease was the same number written on Oboh's piece of paper (the Verizon pre-paid cellular phone) (19 R. 221-22, 275-76).

Agent Tyler subpoenaed Southwest's records for any travel by Sydney Parker (19 R. 159-60). The credit card used to purchase Parker's ticket on August 30, 2001, was also used to purchase a ticket for Sodik Adigun on August 27, 2001 (19 R. 160). Agent Tyler compared three photographs: (1) the photograph on Sodik Adigun's Illinois identification card; (2) Sodik's passport photograph obtained from Oboh's attorney; and (3) the photograph on Taiye Kassim's Illinois driver's license (19 R. 161, 224-26; Gov. Exs. 11, 58, 68). The photographs matched (19 R. 161).

On March 18, 2004, Aransiola was arrested in Chicago at 6950 South Jefferies (18 R. 250-51). After a post-arrest interview with Aransiola, agents determined that

---

[11] Agent Tyler, who was present during the arrest, testified Kassim was arrested on November 25, 2004 (19 R. 221, 297).

Aransiola had another residence at 5140 South Woodlawn (18 R. 251). Aransiola

consented to a search of the Woodlawn address (18 R. 251-52, 261; Gov. Ex. 57).

ICE Agent Morissette searched the address and found, on the floor in the closet of the

studio, a spiral notebook, which was sent to Agent Tyler (18 R. 260-63; Gov. Ex. 53).

The notebook belonged to Tokunbo, who was taking college classes; the notebook

had been at the South Indiana apartment when Tokunbo, Bolaji, and Faleru lived

there, and some of the handwriting in the notebook was Bolaji's and Faleru's (18 R.

320-21). The notebook contained names of drug couriers, amounts of money for

heroin, and references to airline reservations and the clothes some drug couriers

would be wearing upon arrival in the United States (18 R. 325-30). Bolaji told

Tokunbo to write down the figures and record their investments (18 R. 363-64).

Tokunbo did not live at the Woodlawn address and did not know anyone who lived

there (18 R. 330).

## SUMMARY OF ARGUMENT

I. The evidence is sufficient to support Aransiola's and Kassim's convictions.

The evidence against both defendants is overwhelming. The couriers who personally

and extensively dealt with the defendants testified against them. The couriers'

testimony was corroborated by airline records, apartment lease records, and

photographs. Nevertheless, a conspirator's uncorroborated testimony is sufficient to convict.

II. The district court acted within its discretion in denying Kassim's motion for mistrial. Kassim was in street clothes, when two jurors possibly saw him in handcuffs in the hallway for two or three seconds. Kassim did not request a cautionary instruction, and he has not shown actual prejudice.

III. There is no claim under *United States v. Booker*, 125 S. Ct. 738 (2005) because Aransiola and Kassim were sentenced under advisory guidelines. They were sentenced within the advisory guideline range (in fact at the bottom of the range) and thus their sentences were reasonable.

IV. The two-level adjustment for use of a minor under USSG § 3B1.4 was correctly applied to Aransiola. Every circuit to have addressed the issue has held that the defendant does not have to know the participants in the crime are minors for the adjustment to apply. At any rate, the preponderance of the evidence shows that Aransiola knew some of the couriers were minors. Aransiola routinely reviewed the couriers' U.S. passports, which prominently display the person's birth date.

V. Kassim's challenge to the court's methodology in determining drug quantity is waived under the invited-error doctrine. Kassim intentionally abandoned his arguments in the district court. Alternatively, the court did not plainly err in

49

determining the drug quantity attributable to Kassim at sentencing.  Based on the investigative reports from the prosecutor and from Customs, and interviews with the case agent, the PSR clearly set forth the basis for its drug quantity determination. Kassim never objected to the drug quantity and never offered any rebuttal evidence. The court therefore could adopt the PSR without any further inquiry.

VI.  The district court's factual finding that Kassim was a manager or supervisor is plausible in light of the entire record and thus not clearly erroneous. Kassim received the heroin in Chicago, paid the couriers, and sometimes escorted them to Chicago.  Additionally, Oboh recruited Oboite at Papa's and Kassim's direction.  Although Kassim objected to the aggravating role adjustment, he did not present any rebuttal evidence.  The court could therefore properly adopt the PSR.

## ARGUMENT

### I. THE EVIDENCE IS SUFFICIENT TO SUPPORT ARANSIOLA'S AND KASSIM'S CONVICTIONS. (Responsive to Aransiola's Issues 7 - 10 and Kassim's Issue 2).

A.    Standard of Review

On appeal, Aransiola contends the evidence is insufficient on counts one and two to prove his identity as the person who provided drugs to couriers, transported them to Ghana, arranged their travel to the United States, and housed them in Chicago. Kassim contends the evidence is insufficient on counts two, three, four, and

50

six because the evidence showed only his mere acquaintance with conspirators, and other than Kazeem's "uncertain testimony," there was no evidence he knowingly assisted drug couriers. Kassim does not challenge the sufficiency of count one (conspiracy to import heroin).

As explained below, Aransiola moved for judgment of acquittal under Fed. R. Crim. P. 29 as to all counts, so his sufficiency challenge is properly preserved for review. Kassim, however, moved for judgment of acquittal only on count three, thereby waiving his other sufficiency arguments. *See United States v. Herrera*, 313 F.3d 882, 884-85 (5th Cir. 2002) (en banc) ("Where, as here, a defendant asserts specific grounds for a specific element of a specific count for a Rule 29 motion, he waives all others for that specific count.").

The court told the parties it would hear Rule 29 motions after the defense case and any government rebuttal (19 R. 330). Aransiola called one witness and rested (19 R. 331-32, 369). Kassim did not call any witnesses.[12] The court stated it would hear Rule 29 motions the next day (19 R. 373). Kassim stated his Rule 29 motion would be on count three (19 R. 373).

---

[12] Outside the jury's presence, the court advised Aransiola and Kassim of their right to testify in their own behalf, but each voluntarily chose not to testify (19 R. 370-72).

51

The next morning, Aransiola moved for judgment of acquittal based on insufficiency of the evidence on all counts (20 R. 4). The court denied the motion (20 R. 4). Kassim stated he was making an identical motion and argued the evidence was insufficient on count three because Chika, Eno, and Parker did not testify, and did not stay with Kassim (20 R. 5). Kassim conceded the government "may have proved Count Four to your Honor's satisfaction for purposes of this motion," but argued the evidence was insufficient on count three (20 R. 5). The court denied the motion (20 R. 9-10). All parties rested (20 R. 12).

With respect to Aransiola's sufficiency challenge and Kassim's sufficiency challenge on count three, the usual "rational jury" standard of review applies. In reviewing the sufficiency of the evidence, this Court reviews all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *See United States v. Villarreal*, 324 F.3d 319, 322 (5th Cir. 2003). This standard applies equally to direct and circumstantial evidence. *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993). "The evidence need not exclude every reasonable hypothesis of innocence and the jury is free to choose among reasonable interpretations of the evidence." *United States v. Brugman*, 364 F.3d 613, 615 (5th Cir.), *cert. denied*, 125 S. Ct. 212 (2004). Neither the jury nor this

Court is required to examine each circumstance in isolation, and any conflict in the evidence must be resolved in favor of the jury's verdict. *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1991).

This Court reviews the jury's verdict with great deference; all reasonable inferences must be drawn, and all credibility determinations made, in the light most favorable to the verdict. *Villarreal*, 324 F.3d at 322. This Court's review of the sufficiency of the evidence does not include a review of the weight or credibility of the evidence, which is within the jury's sole province. *United States v. Hayes*, 342 F.3d 385, 389 (5th Cir. 2003).

With respect to Kassim's sufficiency challenges on counts one, two, and six, this Court reviews those sufficiency claims to determine only whether the record is completely devoid of evidence of guilt. *Herrera*, 313 F.3d at 885. In other words, this Court reviews solely for a manifest miscarriage of justice. *See United States v. Johnson*, 87 F.3d 133, 136 (5th Cir. 1996). This standard is "far more narrow" than plain-error review. *Herrera*, 313 F.3d at 885 n.*. The evidence and all reasonable inferences that may be drawn from that evidence are considered in the light most favorable to the government. *Johnson*, 87 F.3d at 136.

With respect to Kassim's sufficiency challenge on count four, Kassim conceded in the district court that count four had been sufficiently proved (19 R. 5).

53

Consequently, he cannot now argue on appeal that the evidence is insufficient on count four. *Cf. United States v. Solis*, 299 F.3d 420, 452 (5th Cir. 2002) (defendant cannot appeal alleged errors he invited or induced); *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989) ("when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error;'" a defendant cannot appeal invited errors).

B.     Offense Elements: Counts 1 & 2

To establish a conspiracy to possess with intent to distribute under 21 U.S.C. §§ 841 and 846 (count two) or a conspiracy to import under §§ 952, 960, and 963 (count one), the government must prove beyond a reasonable doubt that: (1) an agreement existed between two or more persons to violate the applicable drug law; (2) each alleged conspirator knew of the conspiracy and intended to join it; and (3) each alleged conspirator participated voluntarily in the conspiracy. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998). Proof of an overt act is not required to prove a drug conspiracy. *United States v. Ramirez-Velasquez*, 322 F.3d 868, 880 (5th Cir. 2003).

The agreement does not have to be explicit; it can be inferred from "concert of action," and circumstantial evidence alone can support a drug conspiracy conviction. *United States v. Virgen-Moreno*, 265 F.3d 276, 284-85 (5th Cir. 2001). Voluntary

54

participation in a conspiracy can be inferred from a "collection of circumstances," and "presence and association with other members of a conspiracy, along with other evidence, may be relied upon to find a conspiracy." *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994). "To be convicted of engaging in a criminal conspiracy, an individual need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *United States v. Garcia-Abrego*, 141 F.3d 142, 155 (5th Cir. 1998) (internal quotation marks omitted).[13]

## C.     Offense Elements: Counts 3 & 6

To aid and abet, a defendant must associate with the criminal venture, participate in it, and seek by his actions to make the venture succeed. *United States v. Peters*, 283 F.3d 300, 308 (5th Cir. 2002). "To aid and abet means to assist the perpetrator of a crime by some affirmative act intended to aid the venture, while sharing the requisite criminal intent." *Id.* "A conviction for aiding and abetting the possession of a controlled substance with intent to distribute does not require that [the defendant] have actual or constructive possession of the drug. It only requires that

---

[13] Some panel decisions incorrectly state that once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy. *E.g.*, *Virgen-Moreno*, 265 F.3d at 285. The en banc court eliminated the "slight evidence" rule in 1979. *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir. 1979) (en banc).

[he] associate himself with the venture, and participate in a way calculated to bring about that venture's success." *United States v. Pena*, 949 F.2d 751, 755 (5th Cir. 1991). "The evidence supporting a conspiracy conviction is generally sufficient to support an aiding and abetting conviction as well." *United States v. Gonzales*, 121 F.3d 928, 936 (5th Cir. 1997).

To possess a controlled substance with the intent to distribute, the defendant must (1) knowingly (2) possess a controlled substance (3) with the intent to distribute that substance. *United States v. Garcia-Flores*, 246 F.3d 451, 454 (5th Cir. 2001). The court instructed the jury that "knowingly" means "the act was done voluntarily and intentionally, not because of mistake or accident" (1 R. 374; 4 R. 293).

Possession can be actual or constructive, joint among several defendants, and proved by circumstantial evidence. *United States v. Williams-Hendricks*, 805 F.2d 496, 500 (5th Cir. 1986). Actual possession is when a person "knowingly has direct physical control over a thing" (1 R. 370; 4 R. 289). "Constructive possession" is "'the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance.'" *Williams-Hendricks*, 805 F.2d at 500. In cases of joint occupancy, constructive possession exists if there is "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband." *Mergerson*, 4 F.3d at 349.

56

The court instructed the jury that intent to distribute means intent to "deliver a controlled substance to another, with or without any financial interest in the outcome of this transaction" (1 R. 369; 4 R. 288). "The intent to distribute may be inferred from the value and quantity of the substance possessed." *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).

D.    Aransiola (Bolaji)

Aransiola was convicted of counts one and two – conspiracy to import one or more kilograms of heroin and conspiracy to possess with intent to distribute one or more kilograms of heroin. The evidence of Aransiola's guilt is overwhelming. When viewed in the light most favorable to the verdict, the evidence showed that Aransiola (Bolaji) was a leader in Papa's heroin trafficking operation. Airline records confirmed the couriers' flights.

Several couriers testified about Aransiola's active participation in their smuggling trips. Oboh and Oboite testified regarding their February 18, 2002, smuggling trip from Ghana to Houston, in which they were arrested with almost 1.5 kilograms of heroin. Kazeem testified regarding his March 25, 2002, smuggling trip from Ghana to Minneapolis, where Tokunbo picked him up and escorted him to Chicago. Oludare Adeyemi testified regarding his sister Olukemi's and his March 4, 2002, smuggling trip from Ghana to Minneapolis, where Tokunbo picked them up

and escorted them to Chicago. Akar testified regarding his October 22, 2002, smuggling trip from Ghana to Washington D.C., where Faleru picked him up and escorted him to Chicago. Akar also testified regarding his August 6, 2003, smuggling trip from Ghana to New York, where Faleru was to pick him up and escort him to Chicago, but Akar was arrested with 987.7 grams of heroin. Tokunbo testified about his two smuggling trips from Ghana to Chicago, the first of which was April 15, 2001.

In each of the above trips, Aransiola gave the courier the heroin to swallow and transport from Ghana to the United States, provided the courier with an address to put on the Customs declaration form (either a fake Houston address on Will Clayton Avenue or a Houston address on Angel Island Lane that belonged to Tokunbo's uncle), and instructed the courier on what would happen when he or she reached the United States. Aransiola provided the couriers with clothes, and money for their ticket to Chicago.

Additionally, Tokunbo and Faleru testified that they escorted the couriers to Chicago, removed the heroin from the pellets, and weighed the heroin and put it in sandwich bags, all at Aransiola's direction. Tokunbo and Faleru also testified that Aransiola was in charge and told everyone what to do. Aransiola paid Tokunbo for Tokunbo's investments in the drug smuggling. George testified that on his March 9,

58

2003, smuggling trip from Ghana to Houston, and his October 19, 2003, smuggling trip from Nigeria to New York, Aransiola received the heroin in Chicago.

The statutory quantity threshold of one kilogram, *see* 21 U.S.C. §§ 841(b)(1)(A)(i), 960(b)(1)(A), was established at trial. Oboh was arrested with 857.4 grams of heroin, Oboite with 641.5 grams of heroin, and Akar with 987.7 grams of heroin – a total of 2.4866 kilograms of heroin. The evidence at trial also established numerous other heroin trips. Aransiola does not challenge the element of intent to distribute.[14] Indeed, the jury could infer the intent to distribute from the large heroin quantities in the offense. *See Moreno*, 185 F.3d at 471.

Aransiola's only sufficiency challenge is to his identity as Bolaji. Aransiola was identified at trial as Bolaji by at least five heroin swallowers who had extensive, personal dealings with him: Oboite, Kazeem, Oludare Adeyemi, Akar, and George (17 R. 53-54, 252, 348-49; 18 R. 10-11, 170-71).[15] Tokunbo and Faleru also identified Aransiola as Bolaji (18 R. 284, 404-05). In short, at least seven key participants in the crime unequivocally identified Aransiola as Bolaji. "'As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a

---

[14] Kassim concedes the drug quantity in this case shows an intent to distribute (Kassim's Br., p.25).

[15] Oboh also identified a person in the courtroom as Bolaji, but the record does not expressly reflect it was Aransiola (16 R. 102).

co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict.'" *Medina*, 161 F.3d at 872-73 (quoting *United States v. Westbrook*, 119 F.3d 1176, 1190 (5th Cir. 1997)).

The conspirators' testimony regarding Aransiola's identity as Bolaji was corroborated by Aransiola's name (not Bolaji's) on the lease for the South Indiana apartment, where Tokunbo, Faleru, and other smugglers lived with Aransiola.

Although Aransiola presented a defense witness, his wife Cresie Clay,[16] the jury could reasonably find that the strength of the evidence cast doubt on his defense. That doubt "likely vitiated the effect of any favorable evidence," including that of Aransiola's defense witness. *Moreno*, 185 F.3d at 472. The jury weighed the credibility of all the witnesses and decided in the government's favor, as was within

---

[16] Clay testified she met Aransiola New Year's Eve 2002, and they married on May 13, 2003 (19 R. 333-34). She and Aransiola had a joint checking account (19 R. 343-44). Aransiola's handwriting was not on Tokunbo's notebook (19 R. 345-48). She and Aransiola spent all their time together, living in Chicago, first at her mother's house on South Prairie and then at their own place on South Jeffrey (19 R. 334-35). She never spent the night at 2605 South Indiana or 3440 Cottage Drive (19 R. 337-39). She admitted, however, that Aransiola's handwriting was on the lease to 2605 South Indiana (19 R. 354-55; Gov. Ex. 55). She also testified that she kicked Aransiola out of the house in November 2003 (19 R. 340, 363). Aside from participating in car auctions and selling goat meat, Aransiola was unemployed the entire time Clay knew him (19 R. 336, 359). Clay worked 40 hours per week, and did not know what Aransiola did when she was working (19 R. 351-52, 361-62). Despite his unemployment, Aransiola managed to maintain a separate apartment on Woodlawn (19 R. 365-66).

its sole province.  *United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001); *United States v. Guerrero*, 169 F.3d 933, 940 (5th Cir. 1999).  The evidence is sufficient.

E.     Kassim (Sodik)

Kassim was convicted of counts one and two – conspiracy to import one or more kilograms of heroin and conspiracy to possess with intent to distribute one or more kilograms of heroin.  He was convicted of aiding and abetting possession with intent to distribute heroin on September 10, 2001, and December 2, 2001 (counts three and six).  He also was convicted of interstate travel to promote a conspiracy to possess with intent to distribute heroin on September 10, 2001 (count four).

Kassim contends the evidence showed only his mere acquaintance with conspirators, and that other than Kazeem's "uncertain testimony" that he gave heroin to Sodik, there was no evidence that Kassim knowingly assisted drug couriers.  The record belies the claims.  When viewed in the light most favorable to the verdict, the evidence showed that Kassim received the heroin in Chicago, paid the couriers, and sometimes escorted them to Chicago.

At Papa's and Kassim's direction, Oboh recruited Oboite.  Oboite testified that in preparation for her February 18, 2002, smuggling trip with Oboh from Ghana to Houston, where they were arrested with almost 1.5 kilograms of heroin, she flew to Chicago at Kassim's expense, and talked on the phone with Kassim frequently.

61

Kassim told Oboite it was easy to swallow the heroin pellets. Papa told Oboite that Kassim would send her money to fly to Accra for the smuggling trip, and Kassim sent her $1,320. Oboite testified that Aransiola gave her the heroin for delivery to Kassim in Chicago, and that if she had not been arrested, Kassim would have paid her $35,000 for the smuggling trip.

Kazeem testified regarding his December 3, 2001, smuggling trip with Bisi from Ghana to Houston and then Chicago. In Chicago, Kassim picked up Kazeem and Bisi, and drove Kazeem, Bisi, and Oboh to the apartment. Kazeem passed the pellets, and gave the heroin to Kassim, who paid him $8,000 and paid for his return flight to Lagos.

Faleru testified regarding his smuggling trips from Ghana to Houston on February 21, 2001, and April 13, 2001. In each trip, Kassim picked up Faleru in Houston and flew with him to Chicago on tickets Kassim purchased. In each trip, they took a taxi to Kassim's apartment, where Faleru expelled the pellets and gave them to Kassim, who paid Faleru $10,000. With the former trip, Kassim paid Faleru a partial payment of $2,000, but told him that Papa would pay the rest in Lagos and Papa later paid the remaining $8,000. Faleru testified that Kassim removed the heroin from the pellets and put the heroin in sandwich bags.

62

Counts three and four were based on Atori's September 10, 2001, smuggling trip with Olamide from Ghana to Houston, where Kassim picked them up and escorted them to Chicago. When Atori and Olamide arrived in Houston, Olamide used the restroom in the airport's baggage claim area. Olamide told Atori and Kassim that she had passed all of her heroin pellets, and managed to re-ingest all but one of them. When Atori chastised Olamide for not swallowing all of the heroin, Kassim was sympathetic to Olamide, calling her an angel, and telling Atori not to be so hard on Olamide. Kassim bought Olamide a bottle of water and told her to re-ingest the remaining pellet, which she did. Kassim, Atori, and Olamide flew from Houston to Chicago, where Atori and Olamide passed the heroin.

Additionally, Atori testified when she swallowed the heroin for the trip, Chika, Eno, Juve, and Olamide were present and also swallowed heroin. Airline records showed that Chika flew from Ghana to Houston, arriving on September 9, 2001, the day before Atori's arrival, and that on September 9, 2001, Kassim flew from Chicago to Houston. Airline records also showed that Eno flew from Ghana to Houston, arriving September 11, 2001, and on September 17, 2001 (after U.S. air travel resumed), Eno and Yom Johnson flew to Chicago.

Count six was based on Oboh's December 2, 2001, smuggling trip with Lara from Ghana to Houston and then Chicago. Oboh testified that Kassim picked them

up in Chicago, and took them to Kassim's apartment, where Kassim instructed them to expel the heroin in the bathtub and wash the pellets. Kassim gave Oboh a pre-paid cellular phone. Kassim paid Oboh for passing the heroin.

At least four couriers who extensively and personally dealt with Sodik identified Kassim at trial as Sodik: Oboite, Atori, Kazeem, and Faleru (17 R. 40, 168-69, 241-42; 18 R, 400-01).[17] Even if uncorroborated, the couriers' testimony is sufficient to convict. *See Medina*, 161 F.3d at 872-73. At any rate, the couriers' identification was corroborated by other evidence. Agent Nicodemus identified Kassim as Sodik (18 R. 248-49). Agent Tyler compared three photographs: (1) the photograph on Sodik's Illinois identification card; (2) Sodik's passport photograph, which Sodik had given to Oboh; and (3) the photograph on Kassim's Illinois driver's license. All three photographs matched.

Kassim calls Kazeem's testimony that Kazeem gave Kassim heroin "uncertain," but there was nothing uncertain about the testimony. Further, Kazeem was not the only courier who testified he gave heroin to Kassim. Faleru testified he gave heroin pellets to Kassim and watched Kassim remove the heroin from the

---

[17] Oboh also identified a person in the courtroom as Sodik, but the record does not expressly reflect it was Kassim (16 R. 80).

pellets, weigh the heroin, and put the heroin in sandwich bags. The jury weighed the credibility of all witnesses, and decided in the government's favor.

The evidence is sufficient on count three, Kassim's only preserved sufficiency challenge. The record is not completely devoid of evidence of guilt regarding the other counts.

### II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING KASSIM'S MOTION FOR MISTRIAL. (Responsive to Kassim's Issue 1).

A.    Standard of Review

This Court reviews the denial of a motion for mistrial for an abuse of discretion. *United States v. Akpan*, 407 F.3d 360, 366 (5th Cir. 2005).

B.    Facts

At 5:37 p.m., on June 23, 2004, after Tokunbo finished testifying, the court took a break and the jury exited the courtroom (18 R. 380). During the break, two jurors possibly saw Kassim in handcuffs in a hallway. Deputy U.S. Marshals Perez and Paz explained what happened.

During the break, Deputy Paz ensured the hallway was clear, and secured the jury room door so that no one would exit (18 R. 380-81). Deputy Perez brought both defendants in the hallway (18 R. 381). Deputy Perez was by the courtroom door, which is across the hall from the jury room door (18 R. 384). With his back to the

hallway, Deputy Perez was about to uncuff Kassim, when two jurors opened the door to the hallway and stepped out of the jury room (18 R. 381, 383).  Deputy Paz was standing in front of the jury door and told the jurors to step back in the room (18 R. 381, 383-84).  According to Deputy Paz, the jurors were out of the room for "[a]bout two or three seconds" (18 R. 384).  Aransiola was already uncuffed and standing in the door to the courtroom (18 R. 381-83).  By the time the jurors walked by, Aransiola was already in the courtroom (18 R. 383).

Kassim moved for a mistrial "based on the substantial prejudice to the defendants when the jury sees them in handcuffs" (18 R. 382).  The court noted that "the issue really only relates to Mr. Kassim" (18 R. 383).  The court denied the motion for mistrial:

> I'm sensitive to this issue, but I'm not going to grant the motion.  I think that the – it's questionable how much these jurors saw, but I'm not prepared to grant a motion for a mistrial on this basis.  The prejudice to me is not sufficient to warrant a mistrial under all the circumstances and so the motion is denied.
>
> And I will note for the record that the party – the men are in street clothes and, you know, look, you know, like regular free world people, and all the witnesses have been – that have been testifying are in their jumpsuits and other things, and I don't think the jury's fully aware of all the circumstances.  So I think that the likelihood of any material prejudice is remote at best.

(18 R. 384-85).  Kassim did not request a cautionary instruction.

C.     Discussion

In *United States v. Escobar*, 674 F.2d 469, 479-80 (5th Cir. 1982), the defendant

moved for mistrial after the government rested its case because two jurors briefly

observed U.S. Marshals transporting the defendant while he was handcuffed.   In

affirming the denial of the motion for mistrial, this Court observed:  "The conditions

under which the defendants were seen were routine security measures rather than

situations of unusual restraint such as shackling of defendants during trial." *Escobar*,

674 F.2d at 479.  The defendant had not shown actual prejudice, and failed to request

a cautionary instruction. *Id.* at 480.

Kassim likewise has not shown actual prejudice.  As Kassim concedes on p.19

of his brief, he was not restrained in the courtroom.  The record shows that Kassim

was in street clothes, when only two jurors possibly saw him in handcuffs in the

hallway for two or three seconds.  Kassim did not request a cautionary instruction.

Under these circumstances, the court acted within its discretion in denying the motion

for mistrial. *See United States v. Webster*, 750 F.2d 307, 331 (5th Cir. 1984) (no abuse

of discretion in denial of motion for mistrial when some, but not a majority, of the

venire panel probably saw the defendant in handcuffs in the hallway because the

defendant was in a coat and tie, the incident was fleeting, and the defendant did not

request a cautionary instruction); *United States v. Diecidue*, 603 F.2d 535, 549 (5th

67

Cir. 1979) ("brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice.").

> III.  THERE IS NO CLAIM UNDER *UNITED STATES V. BOOKER*, 125 S. CT. 738 (2005) BECAUSE ARANSIOLA AND KASSIM WERE SENTENCED UNDER ADVISORY GUIDELINES. (Responsive to Aransiola's Issues 1-5 and Kassim's Issue 3).

A.     Standard of Review

This Court reviews the sentence to determine whether it is reasonable in light of the factors in 18 U.S.C. § 3553(a).  *United States v. Booker*, 125 S. Ct. 738, 765-67 (2005).  A sentence within the properly calculated guideline range is reasonable.  *United States v. Mares*, 402 F.3d 511, 519 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005).

B.     Facts

Aransiola and Kassim were sentenced under the 2004 edition of the U.S. Sentencing Guidelines ("USSG") (Aransiola's PSR ¶ 51; Kassim's PSR ¶ 32). Aransiola's PSR held him responsible for 25 kilograms of heroin and recommended a base offense level of 36 (PSR ¶¶ 46, 52).  *See* USSG § 2D1.1(c)(2) (at least 10, but less than 30 kilograms of heroin is offense level 36).  The PSR recommended a four-level increase because Aransiola was an organizer or leader in the offense (PSR ¶ 55).

*See* USSG § 3B1.1(a). The PSR also recommended a two-level increase because Aransiola used a minor in the offense (PSR ¶ 56). *See* USSG § 3B1.4. Aransiola's total offense level was 42, his criminal history category was I, and his guideline range was 360 months to life (PSR ¶¶ 62, 65, 88).

Kassim's PSR held him responsible for 16.6 kilograms of heroin and recommended a base offense level of 36 (PSR ¶¶ 27, 33; PSR Second Addendum, p.2; 1 R. 457; 22 R. 6). *See* USSG § 2D1.1(c)(2) (at least 10, but less than 30 kilograms of heroin is offense level 36). The PSR recommended a three-level increase because Kassim was a manager or supervisor in the offense (PSR ¶¶ 27, 36). *See* USSG § 3B1.1(b). The PSR also recommended a two-level increase because Kassim used a minor in the offense (PSR ¶ 37). *See* USSG § 3B1.4. Kassim's total offense level was 41, his criminal history category was I, and his guideline range was 324 to 405 months (PSR ¶¶ 43, 46, 66).

On December 29, 2004, Aransiola filed PSR objections under *Blakely v. Washington*, 542 U.S. 296 (2004), to his guideline increases for drug quantity, organizer/leader, and use of a minor because those facts had not been alleged in the indictment or found beyond a reasonable doubt by the jury (4 R. 336).

On January 12, 2005, the Supreme Court rendered its decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which applied the reasoning of *Apprendi v. New*

*Jersey*, 530 U.S. 466 (2000) and *Blakely* to the Guidelines. *Booker*'s holding is two-fold: (1) facts (other than prior convictions) that increase the sentence under mandatory Guidelines violate the Sixth Amendment if not found by a jury or admitted by the defendant and (2) as a remedy, the Guidelines are now advisory. Although the Guidelines are advisory, the sentencing court "must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S. Ct. at 767.

On January 20, 2005, Kassim filed *Blakely*-based PSR objections, contesting his guideline increases for drug quantity, manager/supervisor, and use of a minor because those facts had not been alleged in the indictment or found beyond a reasonable doubt by the jury (1 R. 432-45).

At sentencing on January 31, 2005, the court explicitly acknowledged *Booker* and the advisory nature of the guidelines, but noted the court still had to consider the Guidelines and could tailor a sentence in light of other statutory concerns (22 R. 3). The court stated that in addition to the guideline factors, it would rely on the factors set forth in 18 U.S.C. § 3553(a) to fashion the appropriate sentence (22 R. 4). The court further stated that it would give considerable weight to the applicable guideline range, but "[a]ny wording or comments by this court that the Guidelines are anything more than advisory is unintended" (22 R. 4). The judge continued: "I view the Guidelines as advisory. They are not mandatory, and any comments that I may make

70

should not be construed to the contrary" (22 R. 4).  The court stated it would make its sentencing findings by a preponderance of the evidence, which "is the only logical interpretation of [Justice Breyer's] remedies opinion in *Booker*" (22 R. 5, 38-39).

The court noted Aransiola's *Blakely* objections were moot after *Booker* and overruled the objections (22 R. 38-39).  Kassim conceded that paragraphs 14-27 of his written PSR objections were *Blakely* objections (22 R. 44).  The court overruled those objections based on *Booker* (22 R. 44).

C.    There is no *Booker* error because Aransiola and Kassim were sentenced under advisory guidelines.

Aransiola and Kassim contend their sentences were increased based on guideline facts not alleged in the indictment or found beyond a reasonable doubt by the jury, specifically, the facts supporting the guideline increases for drug quantity, aggravating role, and use of a minor.

There was no *Booker* error in this case because Aransiola and Kassim were not sentenced under mandatory Guidelines.  *Booker* held that the mandatory nature of the Guidelines combined with judicial fact-finding on facts that increase the sentence implicates the Sixth Amendment.  *Booker*, 125 S. Ct. at 749-50.  "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets

71

of facts, their use would not implicate the Sixth Amendment." *Id.* at 750. The Court "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." *Id.* "For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Id.* Because Aransiola and Kassim were sentenced under advisory Guidelines, their guideline increases, even those found solely by the judge, do not implicate the Sixth Amendment.

Additionally, this Court has recognized that the preponderance of the evidence standard still applies at sentencing after *Booker*:

> The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.

*Mares*, 402 F.3d at 519.

The only question is whether Aransiola's and Kassim's sentences are reasonable in light of the factors set forth in 18 U.S.C. § 3553(a). The court determined Aransiola's guideline range to be 360 months to life (22 R. 45-46). The court was unpersuaded by Aransiola's claims of misidentification (22 R. 51). The judge remarked that Aransiola committed "a really serious, serious offense" and it "is

72

the worst drug case I have ever seen" in a decade on the bench (22 R. 52-53). The court therefore refused to sentence below the advisory guideline range, noting a sentence within the guideline range addressed all of the § 3553(a) factors (22 R. 53). The court considered Aransiola's history and characteristics and impoverished background and sentenced him to the bottom of his guideline range, 360 months (22 R. 52, 54).

The court determined Kassim's guideline range to be 324 to 405 months (22 R. 57). The court noted Kassim was an integral part of the operation and thus required a sentence "materially more than the couriers" (22 R. 65-66). The court sentenced Kassim to the bottom of his guideline range, 324 months (22 R. 66-67). The court stated that although it was a stiff sentence, it was appropriate "given the quantity of drugs and number of trips and the number of other people involved in this scheme that he assisted" (22 R. 66). The court noted Kassim's sentence reflected the seriousness of the offense, promoted respect for U.S. law, and provided just punishment (22 R. 66-67). *See* 18 U.S.C. § 3553(a)(2)(A).

The court exercised its discretion to impose a sentence within the properly calculated guideline range; therefore, "little explanation is required." *Mares*, 402 F.3d at 519. In its reasonableness review, this Court "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines." *Id.* The

district court nevertheless provided reasons for sentencing within the guideline range. A sentence within the properly calculated guideline range is reasonable. *Id.* ("it will be rare" for this Court to hold that a Guidelines sentence is unreasonable). Aransiola's and Kassim's sentences are reasonable.

> IV. THE TWO-LEVEL ADJUSTMENT FOR USE OF A MINOR UNDER USSG § 3B1.4 WAS CORRECTLY APPLIED TO ARANSIOLA. (Responsive to Aransiola's Issue 6).

A.    Standard of Review

This Court reviews *de novo* the district court's interpretation and application of the sentencing guidelines, and its factual findings in applying the guidelines for clear error. *United States v. Creech*, 408 F.3d 264, 270 n.2 (5th Cir.), *cert. denied*, 126 S. Ct. 777 (2005).

B.    Discussion

Section 3B1.4 provides for a two-level increase "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection." USSG § 3B1.4. If the defendant used or attempted to use more than one minor, an upward departure may be warranted. USSG § 3B1.4, cmt. n.3. The evidence at trial showed that at least two minors swallowed heroin and transported it to the United States – Bisi, who was 16 years old, and her sister Lara,

who was 14 years old (16 R. 119; 17 R. 240). According to Aransiola's PSR, Eddo was also a minor (PSR ¶ 21).[18]

Aransiola's PSR recommended a two-level increase because he used a minor in his crime (PSR ¶ 56). *See* USSG § 3B1.4. Prior to sentencing, Aransiola objected to the two-level increase, claiming he did not know the couriers' ages (4 R. 337). At sentencing, the court overruled the objection based on decisions from other circuits that hold the adjustment does not require the defendant's knowledge of a participant's minor status (22 R. 37-38). *See* PSR Addendum, p.2 (citing cases). The court recognized the Guidelines as advisory and stated it would "take into account the defendants' knowledge or lack of knowledge or the relevance of their knowledge" in imposing sentence (22 R. 38).

On appeal, Aransiola contends the adjustment cannot apply absent proof he knew the couriers were minors. The guideline's plain language does not impose a knowledge requirement on the defendant. *See United States v. Boudreau*, 250 F.3d 279, 285 (5th Cir. 2001) (looking to a guideline's plain language to interpret its meaning). Indeed, the circuits that have addressed the issue have all held that section 3B1.4 does not require that the defendant know the people used in the offense are minors. *See United States v. Lewis*, 386 F.3d 475, 479-80 (2d Cir. 2004), *cert.*

---

[18] Kassim's PSR identifies Olamide as a minor (PSR ¶ 19).

*denied*, 125 S. Ct. 1355 (2005); *United States v. Thornton*, 306 F.3d 1355, 1358-60 (3d Cir. 2002); *United States v. Gonzalez*, 262 F.3d 867, 870 (9th Cir. 2001); *United States v. McClain*, 252 F.3d 1279, 1284-87 (11th Cir. 2001). *Thornton* observed that the First, Fourth, and Eighth circuits have held the same in unpublished decisions. *Thornton*, 306 F.3d at 1358 n.1 (citing cases).

Applying section 3B1.4 without a knowledge requirement does not violate Aransiola's due process rights because the adjustment does not increase his statutory maximum, negate the presumption of innocence, relieve the government of its burden of proof, or create a separate offense requiring a separate penalty. *See Thornton*, 306 F.3d at 1359-60; *Gonzalez*, 262 F.3d at 870. This "interpretation of section 3B1.4 does not threaten to penalize otherwise innocent conduct, for defendants have no right to solicit or conspire with others (no matter what their ages) to commit crime." *McClain*, 252 F.3d at 1286.

At any rate, a preponderance of the evidence shows Aransiola knew he used minor couriers. As the prosecutor argued at sentencing, Aransiola checked his couriers' U.S. passports, which prominently display the person's birth date (Doc. 248; 22 R. 29-30).[19]

---

[19] On January 11, 2005, the United States filed a written response to Aransiola's PSR objections (Doc. 248), but that pleading is inexplicably omitted from the record. The United States has filed a motion to supplement the record with the omitted document.

V.  KASSIM'S CHALLENGE TO THE CUORT'S METHODOLOGY IN DETERMINING DRUG QUANTITY IS WAIVED UNDER THE INVITED-ERROR DOCTRINE.  ALTERNATIVELY, THE COURT DID NOT PLAINLY ERR IN DETERMINING THE DRUG QUANTITY ATTRIBUTABLE TO KASSIM AT SENTENCING. (Responsive to Kassim's Issue 4).

A.    Standard of Review

For the first time on appeal, Kassim contends the drug quantity attributed to him at sentencing was not proved by a preponderance of the evidence.  He challenges the court's methodology of multiplying the average number of pellets by the average net weight of the pellets, but he intentionally abandoned that argument at sentencing (22 R. 44).  Consequently, Kassim waived any error under the invited-error doctrine. *See United States v. Solis*, 299 F.3d 420, 452 (5th Cir. 2002) (defendant cannot appeal alleged errors he invited or induced); *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989) ("when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error;'" a defendant cannot appeal invited errors).

Alternatively, this Court reviews solely for plain error.  *See, e.g., United States v. Jimenez*, 256 F.3d 330, 340 (5th Cir. 2001).  To establish plain error, the defendant must prove four things:  (1) an error (2) that is clear or obvious, (3) that affected his substantial rights, and (4) that seriously affected the fairness, integrity, or public

77

reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-34 (1993). This Court's decision to reverse under plain-error review is discretionary, and this Court will not do so unless the fourth prong of plain-error review is met. *Id.* at 735-36.

B.    Facts

The PSR and its second addendum held Kassim responsible for 16.6 kilograms of heroin and recommended a base offense level of 36 (PSR ¶¶ 27, 33). *See* USSG § 2D1.1(c)(2) (at least 10, but less than 30 kilograms of heroin is offense level 36). This amount did not include 790.4 grams originally attributed to Kassim in PSR ¶ 14 (PSR Second Addendum, p.2). The PSR provided a table of the heroin quantities attributable to Kassim in PSR ¶ 26. The PSR noted that many of the smuggling trips were based on historical accounts and not on drug seizures, that couriers swallowed between 50 and 120 pellets, and that Papa routinely insisted the couriers swallow at least 100 pellets (PSR ¶ 12). In trips where the drug quantity was unknown, the PSR estimated 80 pellets per courier (PSR ¶ 12). "Lab analysis of the heroin seizures determined the average net weight per pellet was between 9 to 10 grams of heroin" (PSR ¶ 12).

Prior to sentencing, Kassim filed PSR objections, contesting his guideline increase for drug quantity because it had not been alleged in the indictment or found

beyond a reasonable doubt by the jury (1 R. 432-45). *See Blakely v. Washington*, 542 U.S. 296 (2004). At sentencing, the court noted Kassim had objected to "the average number of pellets per carrier multiplied by an average net weight" (22 R. 44). Kassim stated "that's basically a preservation of [the] Sixth Amendment" (22 R. 44). Kassim also conceded that his objections to PSR ¶¶ 14-27 were *Blakely* objections, rather than substantive objections to the guideline increases (22 R. 44). The court overruled the objections to PSR ¶¶ 16-23, 25-26 as Sixth Amendment *Blakely* objections (22 R. 44). Kassim therefore intentionally abandoned any argument regarding the court's drug quantity determination based on the average number of pellets and the average net weight. As noted, the issue is waived under the invited-error doctrine.

The court noted that it made its own chart regarding the drug quantity attributable to Kassim and made the chart part of the record (1 R. 456-57; 22 R. 5-6). The court made the chart to ensure Kassim "was actually connected" to each of the drug quantities attributed to him in the PSR (22 R. 6). The court agreed with the PSR Second Addendum and eliminated 790 grams of heroin attributed to Kassim in PSR ¶ 14, but  noted the change was immaterial because he would have to be under 10 kilograms of heroin to reduce his offense level (1 R. 457; 22 R. 6).Kassim did not argue, as he does on appeal, that the court's methodology in determining drug

quantity failed to satisfy the preponderance-of-the-evidence standard. At the very least, the plain-error standard of review applies.

## C.    Discussion

Drug quantity "includes the drugs for which the defendant is directly responsible and the drugs that can be attributed to him in a conspiracy as relevant conduct." *United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001); *see* USSG § 1B1.3. "Where there is no drug seizure . . . , the court shall approximate the quantity of the controlled substance." USSG § 2D1.1, cmt. n.12. The court may consider, but is not limited to, "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." *Id.*

For each controverted sentencing matter, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). This Court has, however, rejected any requirement that the district court formally regurgitate each controverted fact it determines. *United States v. Carreon*, 11 F.3d 1225, 1231 (5th Cir. 1994). Rather, because the PSR bears such sufficient indicia of reliability that the district court can consider it as evidence, the district court can adopt the PSR's facts without further inquiry if those facts have an

adequate evidentiary basis and the defendant does not present rebuttal evidence. *United States v. Peters*, 283 F.3d 300, 314 (5th Cir. 2002); *Cooper*, 274 F.3d at 239. Mere PSR objections do not suffice as competent rebuttal evidence. *United States v. Lowder*, 148 F.3d 548, 552 (5th Cir. 1998). A court's adoption of the PSR satisfies Rule 32 if the PSR's findings "are so clear that the reviewing court is not left to second-guess the basis for the sentencing decision." *Carreon*, 11 F.3d at 1231.

For the first time on appeal, Kassim contends the court erred in determining drug quantity by multiplying the average number of pellets by the average weight of the pellets. He contends the drug quantity was therefore not proved by a preponderance of the evidence. Specifically, Kassim challenges the following drug quantities attributed to him in the PSR:

> (1) PSR ¶ 17 – Florence Martins's (Lara's)[20] December 2, 2001, trip, where Oboh recalled Lara swallowed between 50 to 60 pellets (450 grams). Oboite corroborated the trip;
>
> (2) PSR ¶ 18 – a December 2001 trip in which Bisi (whom the PSR called Kazim) smuggled 70 pellets (630 grams) and Lara smuggled 50 pellets (450 grams). Airline records and Kazeem corroborated the trip;

---

[20] The PSR incorrectly identified "Martins" as Bisi. The evidence at trial showed Martins was Bisi's sister Lara.

(3) PSR ¶ 19 – Atori's August 2001, trip, in which she swallowed 80 pellets (720 grams),[21] Olamide swallowed 100 pellets (900 grams), Eno swallowed 101 pellets (909 grams), Chika swallowed 100 pellets (900 grams), and Juve swallowed 100 pellets (900 grams);

(4) PSR ¶ 22 – Tayo Ayoade's trips on January 22, 2001, and April 11, 2001, each involving 80 pellets (720 grams) for a total of 1,440 grams.[22] Faleru's February 20, 2001, confirmed by airline records, in which he was paid $9,500, which the PSR estimated was for 95 pellets (855 grams). Tokunbo's attempted flight, in which he swallowed 65 pellets (585 grams);

(5) PSR ¶ 23 – Agbola's July 23, 2001, trip from Ghana to Amsterdam to Houston, in which he swallowed 80 pellets (720 grams). Airline records confirmed Agbola and Kassim flew from Houston to Chicago the next day.

(6) PSR ¶ 25 – Oluwafunmilayo Adebayo's June 2003 trip, in which she kept the heroin for herself and sold it with her husband. The estimated quantity was 80 pellets (720 grams).

The PSR was based upon investigative material from the prosecutor and Customs, and interviews with the case agent (PSR ¶ 4). The PSR and addenda, which the district court adopted, clearly set forth the basis for the drug quantity, and Kassim did not offer any rebuttal evidence. *See United States v. Route*, 104 F.3d 59, 64 (5th Cir. 1997) (finding no error in the court's adoption of the PSR regarding a loss

---

[21] On p.38 of his brief, Kassim incorrectly suggests Atori's aforementioned 720 grams of heroin was from the September 14, 2002, trip, in which she was arrested.

[22] Ayoade told Faleru that his April 11, 2001, trip, was his fifth smuggling trip; airline records confirmed that Ayoade had flown from Accra to Amsterdam to Houston on January 22, 2001 (PSR ¶ 21).

amount more than that established at trial because the defendant did not offer any rebuttal evidence); *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995) (finding no error in the court's adoption of the PSR regarding drug quantity because although no testimony was heard on the issue, the defendant did not request an evidentiary hearing). Kassim has not shown that the PSR's facts regarding drug quantity are materially untrue. *See Valencia*, 44 F.3d at 274. Kassim has not shown plain error.

> VI. THE DISTRICT COURT'S FACTUAL FINDING THAT KASSIM WAS A MANAGER OR SUPERVISOR IS PLAUSIBLE IN LIGHT OF THE ENTIRE RECORD AND THUS NOT CLEARLY ERRONEOUS. (Responsive to Kassim's Issue 5).

A.     Standard of Review

This Court reviews the district court's finding that the defendant was a manager or supervisor for clear error. *United States v. Peters*, 283 F.3d 300, 314 (5th Cir. 2002). A factual finding is not clearly erroneous if it is plausible in light of the whole record. *Id.*

B.     Discussion

A defendant's offense level is increased by three levels if he "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." USSG § 3B1.1(b). "A 'participant'

83

is a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1, cmt. n.1. Some factors that distinguish a leader/organizer from a manager/supervisor include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG § 3B1.1, cmt. n.4.

To qualify for the adjustment, the defendant must have occupied an aggravating role as to at least one of the participants. USSG § 3B1.1, cmt. n.2. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." USSG § 3B1.1, cmt. n.3.

The PSR recommended a three-level increase because Kassim was a manager or supervisor in the offense (PSR ¶¶ 27, 36). *See* USSG § 3B1.1(b). At sentencing, the court noted Kassim had objected to his role as a manager (22 R. 40). Kassim argued he did not invest in the drugs and did not arrange for the sale of the heroin (22 R. 41-42). The court stated it would not hold Kassim accountable for investing in drugs, but that his actions in acquiring apartments, shepherding the couriers, and

84

paying the couriers indicated he was a manager (22 R. 40-41).  The court found that "Kassim's own involvement clearly involved more than five participants and frankly was otherwise extensive" and thus the managerial enhancement applied under "[e]ither of those two criteria" (22 R. 42-43).  The court overruled the objection (22 R. 43-44).

On appeal, Kassim contends there was no reliable information that he controlled the actions of others.  Although Kassim may have acted under orders from Papa or Aransiola, as Kassim contends, that does not mean he lacked managerial responsibility.  As explained in the sufficiency argument, the evidence showed that Kassim received the heroin in Chicago, paid the couriers, and sometimes escorted them to Chicago.  Additionally, Oboh recruited Oboite at Papa's and Kassim's direction.  Although Kassim objected to the aggravating role adjustment, he did not present any rebuttal evidence.  The court therefore was free to adopt the PSR and addenda.  *See Peters*, 283 F.3d at 314-15; *United States v. Cooper*, 274 F.3d 230, 239 (5th Cir. 2001).

# <u>CONCLUSION</u>

This Court should affirm the judgments of conviction and sentence in their

entirety.

Respectfully submitted,

CHUCK ROSENBERG
United States Attorney

JAMES L. TURNER
Assistant United States Attorney

_____
RENATA A. GOWIE
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208-1129
(713) 567-9362

ATTORNEYS FOR APPELLEE

## <u>CERTIFICATE OF SERVICE</u>

I, Renata A. Gowie, Assistant United States Attorney, hereby certify that on January 5, 2006, two true and correct copies of the foregoing Brief of Plaintiff-Appellee, including an electronic copy of the same as required by 5th Cir. R. 31.1, have been served by placing the same in the United States Mail, postage prepaid, addressed to opposing counsel:

Frank Svetlik
One Riverway, Suite 160
Houston, Texas 77056
Attorney for Aransiola

Yolanda E. Jarmon
2476 Bolsover St., Suite #146
Houston, Texas 77005
Attorney for Kassim

_____
RENATA A. GOWIE
Assistant United States Attorney

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as extended by 5th Cir. R. 32.4, because:

 this brief contains **20, 820** words, excluding the parts
 of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

 this brief has been prepared in a proportionally spaced typeface using Corel WordPerfect 9.0 in Times New Roman, 14 point font for text and 12 point font for footnotes.


_____
RENATA A. GOWIE
Assistant United States Attorney
Date: January 5, 2006